DAWKINS, J.
Plaintiff holds under lease, with the right to take and remove sand and gravel therefrom, a strip of land in section -fronting on the east bank of the Tangipahoa river, near the town of Roseland, in Tangipahoa parish; and defendant owns property in section-immediately opposite that of plaintiff, and on the west side of the river. Defendant Roseland Gravel Company erected a sand and gravel plant on its property during the latter part of 1915, and early in January, 1916, launched a dredge in the river and commenced pumping sand and gravel therefrom.
Plaintiff brought this suit to recover as for an alleged willful trespass, the market value of certain quantities of sand and gravel which it claimed had been taken from its property, upon the theory that its ownership extended to the thread of the stream from which the sand and gravel had been removed.
The defenses were that Tangipahoa river is navigable at the point in question, and its bed the property of the state; that permission had been obtained from the State Department of Conservation to dredge its bed, and in the alternative that no material had been removed east of the thread of the stream, and further in the alternative that, if any of plaintiff’s property had been taken, the same was done in good faith, and defendant was liable for its value in the natural state only.
Opinion.
The case presents, therefore, three questions of fact, (1) as to the navigability of the stream, (2) as to the trespass and quantity of sand and gravel taken and (3) whether the appropriation was in bad faith; and a question of law as to the nature of defendant’s liability.
[1] The record consists of some 700 pages of documents and testimony, the latter written with questions and answers following each other across the entire page without break, and a large number of maps and photographs. All of these we have carefully examined, and are convinced that the finding of the lower court, that the Tangipahoa at the place in question was not navigable in fact or law, was correct. We do not cite the proof on this point in detail, but think it sufficient to say: First, that the United States, government has not considered or treated the river as navigable there, or for *707 some distance towards its mouth, for it has authorized the construction thereon of a number of stationary bridges; that it has not been and is not now being used by any water craft for the purposes of commerce, although occasionally rowboats, and in places small boats with detachable gasoline engines, have been used therein. The stream is narrow, filled with sand, gravel bars, stumps, and logs, and has a fall of from 2% to 5 feet to the mile. If cleaned out, according to one engineer, its current would be converted into a torrent. It rises at times many feet in a few hours, and falls with equal rapidity; but the average stage at no season (save during freshets) renders it, in our opinion “navigable” at or near Roseland within the fair meaning of that term. Delta Duck Club v. Barrios, 135 La. 357, 65 South. 489.
It follows, therefore, that the riparian proprietors own the bank and bed to the thread of the stream. C. C. 513, 514, 515.
It appears to be conceded by defendant that its employes did dredge some sand and gravel from the east side of the thread of the stream; but the dispute is as to the quantity and the circumstances of the taking, that is, whether in good or bad faith.
Defendant built and launched into the river, at or near the point where the trespass was committed, a dredgeboat 83 feet long and 26 feet wide, with a draft of 2 or 3 feet. Portions of its hull rested upon the bed of the river, and it becamó necessary to do what is termed “relay” dredging before the boat could be moved. This consisted in pumping the sand, mud, gravel, etc., from the bed of the river in front of the dredge back through and over its stern. Work started on January 14, 1916, and a few days were devoted to the character of work just mentioned, with the bow and pump upstream. The dredgeboat was then turned with its bow downstream, and, in turning, its stern touched the west bank on defendant’s side, and the bow scraped the island or bar on plaintiff’s side of the river.
In front of plaintiff’s property on the east side of the river there was a sand bar and two islands, the latter separated from the main bank by a narrow cut-off or slough, through which at low water very little water passed. Between the two islands there was a space of a few feet, covered with- water. But it is not contended that any appreciable quantity of the bar or island farthest downstream was taken by plaintiff, the main contention being that the island opposite the point the dredge was launched, together with a part of a bar extending out from the east bank just above the latter island, was dredged away.
The lower court found that defendant had taken from the property of plaintiff more than the quantity of sand and gravel alleged in the petition, but in its judgment fixed the same at these figures, to wit, 1,664 cubic feet of sand and 8,320 cubic feet of gravel, and that while the officers of the company were free from bad faith, as to its employes the trespass had been willful; and accordingly gave judgment for the full price which the defendant received therefor, or 25 cents per .yard for sand and 75 cents per yard for gravel, or a total of $6,656. From this judgment the defendant appealed.
It was humanly impossible to determine the exact amount of material which had been removed from the east side of the stream, although testimony was given on. that score by engineers who had made surveys, soundings, estimates, etc. However, we take it that counsel for defendant does not seriously question the trial court’s finding, for nothing is said on the point in their brief; their defense being based upon other issues.
[2] The first contention made is that the lease under which plaintiff claims, covering “A one-acre strip of land running the entire length of the tract of land on which he now *709 resides, along the eastern tank of the Tangipahoa river, and also the right to take and remove sand and gravel from said river and along its eastern bank on said strip,” does not convey such an interest as would support the action of trespass; and, further, that plaintiff was not in actual possession, a prerequisite, it is claimed, to the action.
[3] It was admitted that the lessor of plaintiff was the owner of the property covered by the lease; therefore, it is unnecessary to consider the question of title beyond that point. The property covered by the lease was, we think, a strip 210 feet wide measured from the mean low-water mark and extending along the entire front of the lessor’s property, and which lay opposite that of defendant where the dredging was done. While the lease did not in express terms give to the lessee the exclusive right to take sand and gravel from the riparian front, we think by a fair construction that was the intention and effect, for the owner only reserved the right to remove the timber thereon and to take such sand and gravel as might be required for his own néeds. In any event, since defendant does not claim any adverse right from any other source (save that based upon the navigability of the stream and the ownership of the state, in consequence of which it obtained a permit to dredge from the Department of .Conservation), we do not think it is in a position to assail plaintiff’s rights to that extent, and that a prima facie showing was all that was necessary to maintain plaintiff’s action in trespass. -Union Saw Mill Co. v. Starnes, 321 La. 554, 46 South. 649.
The Question of Damages.
The judgment of the lower court allows the full sale price of the sand and gravel, without any deduction for the cost of preparing it for market, upon the theory, as above stated, that the trespass was willful, or, 'as is sometimes expressed, in moral bad faith.
[4] The three stockholders of the defendant company, all of whom live in the city .of New Orleans, are large stockholders in the plaintiff company; but the controlling interest in the latter is owned by another resident of the same city, and there appears to have been some rivalry between the two in acquiring sand and gravel rights in the Tangipahoa river. In fact, the three brothers who own the defendant company attempted to acquire, and perhaps, at one time, thought they had acquired, 50 per cent, of the stock of the plaintiff corporation. So that when defendant prepared to begin operations, Mr. Jahncke, the executive in charge, cautioned and instructed his employés not to go beyond the middle of the stream with the dredge, because, as he says, notwithstanding he believed the stream was navigable and the bed belonged to the state, he did not wish to get into any trouble with the plaintiffs; and the lower court, in its reasons for judgment, found that he was in good faith, although it held the corporation liable for market values without deducting costs of production, upon what it conceived to be the bad faith of certain employés imputable to defendant. Before, or about the time of beginning, Jahncke obtained from the State Department of Conservation a permit to dredge sand and gravel in the Tangipahoa river; and while we have found as a matter of fact it was not navigable, and hence the state was without interest, we find no reason to doubt that he and' the Department were of the bona fide belief that the contrary was true; otherwise, it is not probable that he would have been willing to place himself in a position to have to pay the state for material which he was to take from his own property.
It was stated by Jahncke as a witness, and no effort at contradiction was made, that the only practical way (considering the ex *711 pense of other methods) of beginning the removal of gravel from his own property on the west bank of the river was to launch the dredge in the river where there was plenty of water, necessary for the operation of the pump, and to work into the property from the river, thus having the water to follow the excavating. At the point where the dredge was launched the width of the water from defendant’s side to the island was just about equal to the length of the boat, say about 85 feet, although the main east bank on plaintiff’s side was the width of the island, estimated at about 30 feet, plus the width of the slough or cut-off, estimated at some 20-odd feet. This gave the stream a total width, at that point of, say, between 130 and 140 feet, and put the thread or middle some 65 or 70 feet from defendant’s bank, which, being on the caving side of the river, was practically at Ore water’s edge. As heretofore stated, the dredge was 26 feet wide, and all of the pumping was done with its bow pointed either up or down the river, which position it occupied at all times, save when being turned round. The river’s bed was dredged to varying depths ranging from a few feet to more than 30 feet, and we are convinced that the great bulk of the sand and gravel which came from plaintiff’s side was due, as testified to by men experienced in these matters, to the fact that such materials will cave in all directions surrounding the intake of the pump, or in a circle whose radius is equal at the surface to the depth dredged, and making a hole having the shape of an inverted cone.
The man in charge of defendant’s dredge swore that special effort was made' not to pump'east of the thread of the stream, and, in view of the fact that persons representing or having an interest in plaintiff company were repeatedly going and coming from the scene, we do not believe it appears, after carefully weighing all the evidence, that any one intentionally encroached upon plaintiff’s side, although, as stated, it was conceded on the trial, and does not appear to be disputed by defendant’s brief, that material to the amount alleged was taken which belonged to plaintiff. However, this was after surveys, measurements, soundings, and estimates were made by both sides. As soon as defendant’s attention was called to the contention of plaintiff that sand and gravel were being taken from its property, Jahncke went to the scene, had the dredge moved, and thereafter pursued operations on its own property, excavating on that side what appears from photographs to be quite a lake. Considering that the thread of a stream is an imaginary line, about which men may readily differ, depending upon the sinuosities of the banks, and upon which varying elevations may be taken as the main banks, we do not think it at all improbable that defendant’s employés honestly believed that they were not encroaching upon the property of plaintiff. In any event, the plaintiff bore the burden of making out its case on the facts by a fair preponderance of the testimony, and this we think it has failed to do.
Inasmuch as defendant does not appear to seriously contest the quantity of materials taken, we deem it unnecessary to discuss the question of the relative rights of adjoining owners in removing minerals such as sand and gravel under such circumstances, where it is impossible to take all of one’s own property without drawing a portion of his neighbor’s across the line.
[5] Finding that defendant was in good faith, plaintiff is entitled to recover the value of the minerals in their natural state alone; and. which, according to the proof, was not more than three cents for sand and five cents per cubic yard for gravel. Trust & Deposit Co. v. Investment Co., 107 La. 251, 31 South. 736.
For the reasons assigned, the judgment ap *713 pealed from is amended by reducing it to the sum of $465.92, and as thus amended, it is affirmed; plaintiff to pay the costs of this appeal and defendant the costs of the lower court.
SOMMERVIHLE, J., not having heard the argument, takes no part.