ROGERS, Justice.
 

 This is an appeal from the judgment of the district court in favor of the plaintiff, Wilfred J. Begnaud, State Bank Commissioner in charge of the liquidation of the Canal Bank & Trust Company, and against the defendants, State of Louisiana, State Mineral Board, Grubb & Hawkins, Harbor Oil Company, Inc., Mark Wolff and James G. Cowles. The judgment perpetuates a writ of injunction previously issued, enjoining the defendants from trespassing upon or interfering with plaintiff's possession of the bed of Bayou Sale so far as it lies within the limits of Lots 14, 15-A and 15-B of the lands of the Southern Planting & Development Company, Inc., in Sections 15 and 16, Township 16 South, Range 9 East, in the Parish of St. Mary. The judgment also recognizes plaintiff, in his capacity of liquidator, as the owner of the bed of the bayou to the middle or thread of the stream and quiets his title thereto and possession thereof.
 

 The suit was brought as a simple possessory action, coupled with a demand for injunctive relief, against Grubb & Hawkins, Harbor Oil Company, Inc., Mark Wolff and James G. Cowles. In their answers to the petition, defendants called the State of Louisiana and the State' Mineral Board in warranty. The State and the Mineral Board filed exceptions of no cause
 
 *831
 
 or right of action to the call in warranty. The exceptions were referred to the merits and the State and the Mineral Board, reserving the benefit thereof, answered plaintiff’s original and supplemental petitions.
 

 Briefly stated, plaintiff’s claim is that Bayou Sale is and always has been non-navigable and therefore is owned and possessed by plaintiff and not by the State. On the other hand, -defendants’ claim is that Bayou Sale was a navigable stream on April 30, 1812, the date Louisiana was admitted into the Union, and its bed therefore belongs to the State by virtue of its sovereignty. From which it appears that the question to be determined in the case is whether Bayou Sale, which at one time connected Bayou Teche on the north with East Cote Blanche Bay on the south, was navigable at the time Louisiana became a State. Before considering that question, however, we direct our attention to the issue presented by the exceptions of no cause of action filed by the State and the Mineral Board in the district court and also in this Court to the call in warranty.
 

 It appears from the reasons assigned in writing by the trial judge for granting the preliminary injunction that no argument was submitted: and no authorities furnished on the question raised by the exceptions-to the call in warranty, and he therefore concluded that the exceptions had been abandoned and.that both the'State and the Mineral Board were parties defendant.
 

 The argument ckr the • exceptions in this Court is that the Mineral Board is a State agency and that in executing mineral leases-it does not act as the owner but merely as the agent of its principal and, therefore, can not be called in warranty; and as the State is sovereign and can be sued only in its own courts with its consent, that it also can
 
 not be
 
 called
 
 in
 
 warranty and a judgment rendered against it.
 

 The rights and obligations of the State Mineral Board must be tested by the provisions of Act 93 of 1936 and its amendments, by which the Board was established and under which it is operating. Under the terms of the statute, the Mineral Board was created as a body corporate with all of the usual powers incident to corporations in addition to those conferred upon it by. the statute itself and with express authority to sue and to be sued. The Board is granted full power to lease any lands belonging to the State or the title to which is in the public for mineral development. Under Section 9, the Board is given complete supervision of all existing mineral leases granted by the State or which may be subsequently entered into, in order to determine that the terms of any such lease are fully complied with, and generally is empowered to take any lawful action for the protection of the interest of the State, including the right to institute any action to annul any such lease upon any legal ground whatsoever.
 

 It seems to be clear that the purpose of the Legislature in adopting Act 93 of 1936 was to substitute or superadd the rights and obligations of1 the State Mineral Board to those of the State itself, so far as mineral leases are concerned.,- The lease involved in this litigation shows on its face
 
 *833
 
 that it was granted by the State Mineral Board, acting in behalf of the State, under the authority and in accordance with the terms of Act 93 of 1936. In these circumstances, it is as much the duty of the State Mineral Board as it is that of the State to protect the title to the property leased by it.
 

 The argument that because ordinarily the State as a sovereignty can not be sued in its courts except with its consent is untenable. It overlooks the fact that while the State possesses legislative, public and governmental power in the exercise of which it is a sovereignty and governs its people, it also possesses proprietary and quasi private power conferred upon it not for the purpose of governing its people but for the private advantage of the inhabitants of the State itself as a legal personality. This distinction in the powers of the State was pointed out in the case of State ex rel. Shell Oil Co. v. Register of State Land Office, 193 La. 883, 192 So. 519. In that case this Court held that when the State executed a mineral lease it was acting in its proprietary or quasi private capacity and that having accepted the benefits under the lease it could not escape its obligations — -among which was the obligation of warranty. And the Court properly allowed the assignees of the lessee of the State to call their lessors in warranty to protect their possession of the leased premises.
 

 The further argument is that, conceding the State and the Mineral Board are properly in court under the call in warranty, nevertheless, the judgment of the district court' erroneously condemns them as defendants in the main action and not as defendants under the call of warranty. But this Court can only consider the case in the situation which is presented by the record as, otherwise, the Court would be assuming original jurisdiction on appeal.
 

 This suit was begun as a simple possessory action. In their answers to the petition the defendants, Grubb & Hawkins, Harbor Oil Company, Mark Wolff and James G. Cowles, set up that Bayou Sale was a navigable stream in 1812 and therefore the bed of the Bayou belongs to the State by virtue of its sovereignty. The State and the Mineral Board, when brought into court under the call in warranty, also answered plaintiff’s petition and set up that the ownership of the bed of Bayou Sale, covered by the lease, was in the State and specifically prayed for judgment against plaintiff recognizing and confirming the State’s title to the leased premises. In other words, all the parties litigant opposing plaintiff’s claim to the possession of the bed of Bayou Sale covered by the lease expressly claimed that the title to the property was in the State by virtue of its sovereignty and also expressly prayed for judgment against plaintiff recognizing and confirming the State’s ownership thereof. Both the State and the Mineral Board participated in the trial of the case to the same extent as if the proceeding had been initiated by them. In these circumstances, it can not be disputed that if the district court had decided the issue of title in favor of the State, plaintiff would have been bound thereby and at this late date could
 
 *835
 
 not successfully urge that neither the State nor the Mineral Board were proper parties defendant and that only the possessory action was heard and disposed of by the district court. Conversely, we can conceive of no reason why the State and the Mineral Board are not bound by the judgment of the district court in plaintiff’s favor on the character of the action and the issue of title. As shown by the record, this suit was taken up, tried and decided in the district court as a cumulation of the possessory and petitory actions which, under the provisions of Act No. 82 of 1930, appears to be the proper method of trying and disposing of such suits.
 

 On the merits the case presents a controversy between the owner of property along Bayou Sale on the one hand and the State of Louisiana and claimants under the State on the other hand. As we have hereinabove pointed out, plaintiff and defendants are claiming the identical title or in-' terests in the bed of the bayou. These conflicting claims originated in the following manner:
 

 On April 21, 1938, the State Mineral Board, acting for the State of Louisiana, leased to James G. Cowles, together with other water bottoms, a portion of the bed of Bayou Sale, situated in Sections 15 and 16, Township 16 South, Range 9 East, in the Parish of St. Mary. Cowles assigned the lease to Harbor Oil Company, Inc., which in turn assigned an undivided one-half interest therein to Grubb & Hawkins.
 

 On August 17, 1929, the Canal Bank & Trust Company acquired the property at sheriff’s sale. The property is described in the sheriff’s 1 as Lot 14 and Lots 15-A and 15-B, in accordance with a map of L. A. Loustalot, C. E., dated January 30, 1918. The deed in setting forth the boundaries of the lots contains no reference whatever to Bayou Sale. Lot 14 is described as being' bounded on the east by lots 16 and 17 and not by Bayou Sale. Lot 15 is divided into lot 15-A and 15-B. Lot 15-A is described as being bounded on the east by lot 16 and lot 15-B and not Bayou Sale. Lot 15-B is described as being bounded on the west by the Hardy tract and lot 15-A and not by Bayou Sale. The bayou, although not referred to as a boundary of any of the lots described in the deed, lies within the exterior boundaries of the lots and is included within the calls of the instrument.
 

 Humble Oil & Refining Company acquired a mineral lease covering the property from the Canal Bank & Trust Company and prior to the institution of this suit had completed a producing oil well on each side of Bayou Sale. Each well is located within the approximate center of a 40-acre tract, the dividing line between each tract being the middle or thread of the stream, designated on the plat of Loustalot as Bayou Sale.
 

 A few days prior to the filing of this suit, Grubb & Hawkins entered upon that portion of the bed of Bayou Sale lying approximately midway between the two producing oil wells of the Humble Oil
 
 &
 
 Refining Company and began operations preparatory to the drilling of a well in search of oil and gas. Immediately upon
 
 *837
 
 becoming apprised of these activites of Grubb & Hawkins, the State Bank Commissioner, in charge of liquidating the assets of the Canal Bank & Trust Company, brought this suit claiming title for the Canal Bank in Liquidation to the properties lying adjacent to the banks of Bayou Sale and also to the' bed of the bayou at the site of the proposed oil well.
 

 As we have hereinabove shown, all the parties litigant joined issue on the navigability vel non of Bayou Sale in 1812. The navigability of the Bayou is the principal issue raised by defendants to defeat plaintiff’s claim. Another issue raised by defendants for the same purpose is that inasmuch as plaintiff’s title only extends to the bayou, he does not own any property beyond the water’s edge and hence has no title to the bed of the bayou.
 

 In their argument in support of the proposition that plaintiff’s title ceased at the margin of Bayou Sale, defendants concede there are numerous cases in our jurisprudence sustaining plaintiff’s contention that if the bayou were not navigable in 1812, plaintiff’s title and possession carries to the thread of the stream. But defendants argue with great earnestness that those cases are the result of an uncritical application of common-law authorities without consideration of our own laws and that a re-examination of the doctrine of those cases should be made; or, if not, since this title originated in a Spanish Grant, then our own laws should be analysed with reference to such Grants.
 

 It is the well-settled law of this State that the beds of streams that are not now and never were navigable belong to the riparian owners to the thread or middle of the stream. Amite Gravel & Sand Co. v. Roseland Gravel Co., 148 La. 704, 87 So. 718; Wemple v. Eastham, 150 La. 247, 90 So. 637; Bodcaw Lumber Co. v. Kendall, 161 La. 337, 338, 108 So. 664. And the general rule is that the owner in fee of the bed of the river or other submerged land is the owner of any bar, island or dry land which subsequently may be formed thereon. 45 Corpus Juris, Navigable Waters, sec. 256, pp. 563, 564. The statute law of Louisiana has always provided that islands formed in nonnavigable streams belong to the riparian owners, and it being the universal jurisprudence that, in default of positive law to the contrary, the owners of islands in nonnavigable waters and the owners of the beds of non-navigable waters are the same, it logically follows that the beds of nonnavigable waters belong to the riparian proprietors and our jurisprudence if reexamined as suggested by defendants would remain unchanged. Thus, according to Law 27 Partida' Third, Title XXVIII, from Moreau & Carleton’s Translation of Las Sieta Partidas, in force in 1820, which was translated by legislative authority as embraced in the statute of March 3, 1819, islands arising in rivers belong proportionately to the estates which border on the bank to which they are nearest or most immediate. The pertinent statutory law as it appears and is developed in the several Codes is found in Articles 13 to 17, Book II, Title II, Chapter III, Section 1 in the Code of 1808, Articles 504, 505 and 506
 
 *839
 
 of the Code of 1825 and Article 513 of the Civil Code of 1870, which reads as follows: “Islands and sand bars which are formed in streams not navigable, belong to the riparian proprietors, and are divided among them according to the rules prescribed in the following articles.” Articles 514 and 515 contain the rules referred to in article 513.
 

 The title to the lands in dispute, contrary to defendant’s contention, does not originate in a Spanish Grant and, therefore, there is no necessity for analyzing or discussing our laws relative to such grants. As shown by the record, the section of land at the point defendants propose to drill their oil well was originally claimed from the Spanish Government by one Octavio LeBlanc. The claim was filed in 1802 and embraced lands on each side of Bayou Sale. Although an order of survey was signed by Morales, Intendant of the Province of Louisiana, some time between October 20 and November 8, 1802, the claim was not surveyed for the reasons set forth in the affidavits of Duplantier and Favrot. It follows, therefore, that LeBlanc’s claim did not constitute a completed grant but constituted merely an inchoate title. It was only when his claim was confirmed by Act of Congress on May 16, 1826, c. 62, 4 Stat. 168, that LeBlanc obtained a perfect title. Obviously the Spanish laws which defendants say were in effect in this State from 1763 to 1808, could not affect or control the title which originated in 1826.
 

 In Menard’s Heirs v. Massey, 8 How. 293, 305, 12 L.Ed. 1085, the Supreme Court of the United States was called upon to consider a case arising from the conflict between an old Spanish concession and a title otherwise claimed. In that case the power of the Lieutenant-Governor of Upper Louisiana to grant concessions and the processes by which grantees perfected their titles is discussed. In the course of the discussion, the Court pointed out that according to the eighteenth article of the regulations of Intendant Morales, published in July, 1799, which had the force' of law, those who asked for land and had obtained the first decree by which a survey was ordered to measure and put them in possession and those who, after a survey had been made and they had been put in possession, but had neglected to ask for “a . title to the property” could not be regarded as owners of the land. It is only when their real titles were delivered, completed with all the required formalities, they could be so regarded. The formalities for completing a real title are prescribed by the three preceding articles of the regulations. These formalities, none of which were completed by LeBlanc, are set forth in detail in the opinion of the Court as constituting, in substance, the completed, title, with the observation that “the necessity of a further title than a mere loose order of survey, given by commandants of posts and lieutenant-governors and placed in the hands of the interested party, is too manifest for comment.”
 

 In Menard’s Heirs v. Massey, the Supreme Court of the United States specifically held that a concession made by the Lieutenant-Governor of Upper Louisiana,
 
 *841
 
 calling for no boundaries and never having been surveyed, could not be considered as “property” protected by the Acts of Congress. This holding was approved in Burgess v. Gray, 15 Mo. 220, 223, holding that an unconfirmed title originating under a Spanish Grant has no standing in either a court of law or equity.
 

 The Court further held in Menard’s Heirs v. Massey that upon the transfer of Louisiana the United States succeeded to all the powers of the Intendants-General and could give or withhold the completion of all imperfect titles at its pleasure. This holding was approved in Glenn v. United States, 13 How. 250, 14 L.Ed. 133.
 

 In Chastang v. Dill, 19 Ala. 421, the claimant in his petition produced no evidence of title but alleged that his title had been lost or carried away by the Spanish authorities. The commissioner appointed under the Act of Congress of April 25, 1812, 2 Stat. 713, reported favorably upon the claim which was afterwards confirmed by the Act of Congress on. May 8, 1822, 3 Stat. 699. The Supreme Court of Alabama, citing Menard’s Heirs v. Massey, held that the claimant’s title was founded upon the report of the commissioner and the Act of Congress confirmatory thereof, and not upon any supposed Spanish Grant.
 

 Although Congress intended by the Act of 1807, 2 Stat. 441, that the Commissioners should adjudge the existence of claims held under French and Spanish possessors, it was not intended that a final legal title as against the United States should be made until the bounds of the grant had been ascertained. Until the survey is made, no title attaches to the land, nor could a court ascertain its boundaries, as this power was reserved to the Executive Department of the Federal Government; hence, before such title is confirmed, it has no standing in court and does not relate back. West v. Cochran, 17 How. 403, 15 L.Ed 110.
 

 A confirmation by Act of Congress is .as fully to all intents and purposes a grant as if it contained in terms a grant de novo, equivalent to a patent. Thomas’ Heirs v. Phillips, 7 La.Ann. 546; Jopling v. Chachere, 107 La. 522, 32 So. 243, affirmed by the Supreme Court of the United States, Joplin v. Chachere, 192 U.S. 94, 24 S.Ct. 214, 48 L.Ed. 359, and quoted as authority in Levy v. Gause, 112 La. 789, 36 So. 684; 50 Corpus Juris, Verbo “Public Lands”, sec. 703, p. 1234.
 

 Following the confirmation of LeBlanc’s claim by Act of Congress of May 16, 1826, the land embraced within the claim was surveyed by William Johnson, Deputy Surveyor, in 1827. The field notes and plat prepared by Johnson under date of March 14, 1827, designate two tracts of land lying across from each other' on opposite sides of Bayou Sale. One of the tracts contains 642.01 acres and the other tract contains 269.39 acres. It seems to be undisputed that the two lots of ground designated in plaintiff’s deed as lot 14, containing 100 acres, and lot 15, subdivided into lot 15-A and 15-B, containing 100 acres, on the plan or map of C. A. Loustalot, C. E., dated January 30, 1918, are included in the tracts of land referred to in the Johnson plat. According to plaintiff’s
 
 *843
 
 deed, lot 14, in which it is claimed lies that portion of the bed of Bayou Sale where the proposed oil drilling operations were to take place, is described as fronting on the west side of Bayou Sale. That is the only reference to the bayou contained in the deed. The limits of plaintiff’s lots are designated by lines separating the lots into which a larger tract of land had been subdivided. The eastern or bayou side boundary of plaintiff’s property is designated as lots 16 and 17, which lie across the bayou from lot 14. Under plaintiff’s deed, the eastern boundary line- of lot 14 and the western boundary line of lots 16 and 17 opposite lot 14 coincide and form only one line. If Bayou Sale is not now navigable or was not navigable in 1812, when Louisiana was admitted into the Union, then that line coincides with the thread of Bayou Sale. On the other hand, if the bayou is at present navigable or if it was navigable in 1812, then lot 14 extends only to its west bank and lots 16 and 17 to its east bank, the bayou forming the boundary line between the lots.
 

 Since plaintiff is not excluded by any antecedent title from owning land to the middle or thread of Bayou Sale, his title as a riparian owner extends thereto for the entire width of his property fronting the bayou, if the bayou is not presently navigable and was not navigable in 1812. That legal principle has been firmly established in our jurisprudence and is clearly set forth in the cases to which we have hereinabove referred.
 

 It is not disputed that at the present time Bayou Sale is not navigable at the location of the proposed oil well. The important question, therefore, to be considered and upon the answer to which the judgment to be rendered between the parties depends, is whether the bayou was navigable at that location in 1812, when Louisiana was admitted into the Union. If the bayou was not navigable in 1812, plaintiff’s title to lot 14 at the location in dispute extends to the middle of the stream and the location of the proposed oil well lies on plaintiff’s land and not on property belonging to the State. If, however, the Bayou was navigable in 1812, its bed belongs to the State and plaintiff has no property right therein.
 

 In support of their, respective contentions the parties called many witnesses, expert and lay, and introduced a mass of scientific and documentary evidence.
 

 The condition of Bayou Sale as it appeared in the latter part of 1941 is accurately shown on a map prepared by Arthur D. Kidder, District Cadastral Engineer of the United States Department of Interior, General Land Office, Washington, D. C. This map bears the following certificate of Mr. Kidder as of date, December 1, 1942: “This map exhibit of the abandoned channel of Bayou Sale and the related bodies of water and watercourses, land elevations, drainage and properties, is a true representation of these subjects as of'the period from November 5 to December 10, 1941, based upon field surveys, and a compilation from official plats and maps.” Mr. Kidder testified that he spent the entire period from November 5 to December 10, 1941, in field work in which he
 
 *845
 
 was assisted by Joseph C. Thoma, a cadastral engineer of the General Land Office at Washington, and Henry Meadows, a civil engineer employed by the Humble Oil & Refining Company. The entire length of the channel of Bayou Sale from a point where it formerly connected with Bayou Teche to where it now empties into East Cote Blanche Bay is shown on the map. Eleven cross-sections beginning at the Burguieres Plantation and proceeding down stream to a point about a half mile above where the bayou empties into the bay is also shown on the map. Each of the cross-sections accurately shows ground elevations with reference to mean gulf level and by a comparison of the crossscctions, the gradiant of the bayou is easily discernible. There existed in the bed of the bayou thirty-five artificial obstructions in the nature of ramps and dams, the location of which are set forth on the map. There is also an enlarged contour representation of the cross-section on which is shown the exact location of the proposed oil well in the approximate center of the bed of the bayou. Other detailed information is shown on the contour representation such as the location of submerged stumps, rate of slope of each of the natural levees of the bayou and the location of living trees and old stumps appearing on the natural levees near the bed of the bayou.
 

 The various cross-sections of Bayou Sale reveal that the bayou resembles more a depression of the earth in an open flat country than a stream or bayou. One of the most significant characteristics of the bayou is the absence of any tributaries of any kind flowing or emptying into it throughout its whole course. The entire water shed of the bayou as it exists today comprises an area only of 480 acres.
 

 The condition of Bayou Sale as it appeared in its natural state in February 1819, aproximately seven years after Louisiana had been admitted into the Union, is clearly set forth in the report of James H. Cathcart and James Hutton who, in compliance with instructions received from the Secretary of the Navy, made a search for live oak and red cedar timber through the low lands of South Louisiana. A certified copy of this report was filed in evidence by plaintiff. The excerpts from the report, which are' copied into the transcript, show that on February 25, 1819, Messrs. Hutton and Landreth left Franklin, Louisiana, to explore Bayou Sale and that they arrived on the same day at the sugar plantation of Mr.’ George Royster situated seven miles southwest of Franklin. On February 26, 1819, Messrs. Hutton and Landreth continued their journey down the bayou to within six miles of its mouth. They were looking for live oak and red cedar timber which required a careful examination of the area which they traversed. As shown by their report, they found Bayou Sale within this area to be nothing more than a winding gully 15 feet wide and from 12 to 18 inches deep, filled with cypress knees, which are excrescences from the roots of the trees. They further found that “Bayou Sale runs through a peninsula of arable land not above 5 arpents wide, in a most circuitous and serpentine course from half a mile east
 
 *847
 
 of Mr. Royster’s for 26 miles and empties itself into the Bay of St. Bernard,” (East Cote Blanche Bay). The report shows that on the whole extent of the bayou, both on public and private lands, there was not more live oak than would suffice to build one small vessel, “by hauling it four miles to water carriage” and they therefore concluded that it was “unworthy the attention of the Government”. The testimony of these witnesses who saw that timber cut on the banks of Bayou Sale in February 1819 would have to be hauled four miles to water carriage is a strong indication that the bayou was not a navigable stream in February 1819, and consequently was not a navigable stream in April, 1812, when Louisiana was admitted into the Union.
 

 In support of the scientific testimony given by his experts, plaintiff introduced the testimony of some of the older residents of the vicinity to establish the fact that Bayou Sale is not only not now navigable, but that it was not navigable within their knowledge and by tradition within the knowledge of their ancestors. These witnesses agreed that practically no change has taken place in the physical appearance of the bayou within their memories. The testimony of plaintiff’s experts also discloses that the bayou is not presently a usable waterway, being almost entirely choked with soil deposits, vegetation and living and dead trees. It was stated by these experts that many centuries ago, Bayou Teche was a distributary of the stream then occupying the course now followed by Bayou Teche and as such was a functioning stream; that as such streams usually do, this particular stream formed natural levees which are still ‘perceptible and have an average width of 250 feet. They pointed out that there are no sharp marks in the banks, thus showing that no running water has flowed over the course in recent years. They gave as their opinion that the Mississippi River was a stream that occupied Bayou Teche at that time, but that before the river abandoned its course through Bayou Teche for a new route, the distributary, Bayou Sale, became segregated by means of soil deposits at its junction with the mother stream, and that from that time it became an intermittent stream, functioning only during the seasons of flood and finally becoming a non-functioning or abandoned stream. They came to the conclusion that this severance took place before the Mississippi River abandoned the Teche and that this abandonment occurred about 2,000 years ago and perhaps at even a greater period than that.
 

 These experts expressed the opinion that deterioration promptly set in and proceeded rapidly to choke up the bayou. They based their opinion on the fact that thereafter the bayou’s only source of water supply was a very small amount through seepage with an additional amount through drainage, because the bayou had no connection with any other body of water except East Cote Blanche Bay, into which it flowed. There was very little drainage into it as' its water shed was confined to the area within its natural levees which, as we have shown by the testimony of Mr. Kidder, was estimated to be 480 acres. The experts reason that the deterioration took
 
 *849
 
 place so rapidly that the bed of the bayou quickly filled up and the stream lost its navigability many centuries before the year 1812, and that, in fact, in that year its condition was about the same as it is today.
 

 Plaintiff’s experts found stumps of cypress trees in what was obviously the bed of the bayou, in some instances buried under the fill two or three feet deep. The living age of one of the trees of which the stump only remains was estimated 'to be 775 years. Several of the other trees were estimated to be 200 to 400 years old at the time they died. The experts claim that if the several centuries elapsing since the death of these trees is added to the age of the trees it will show that their origin dates back to the period conforming to the dates of the severance of Bayou Sale from Bayou Teche and the filling up of its channel as theorized and precludes any possibility of the bayou being navigable in 1812. It is the theory of these experts that as cypress trees will not germinate or begin to grow in soil which is covered by water, no water could have been present in the bed of the bayou at the time these trees began to grow, and the absence of water necessarily precludes navigation.
 

 Holes were bored in the bed of the bayou and from what these holes revealed, plaintiff’s experts conclude that at a certain point in the bayou the depth at the height of its efficiency was about 18 feet; that clay and not silt began to deposit, showing the absence of any water movement; then peat or peaty material was formed, establishing the probability of the immobility of the water, since peat does not usually accumulate in running water. The experts pointed out that the root crowns of trees generally lie at the surface of the soil about them and do not alter their level with the rise and fall of the soil level due to deposition erosion. Hence these root crowns can be used to determine the rise and fall of the surface of the soil during the life of the tree. Using this method, they found that the living trees in the bed of the bayou still have their root crowns practically at the surface of the soil, thus showing that practically no change has taken place in the elevation of the bed of the bayou during the life span of the trees, and as some of the trees show ages dating back long before the year 1812, the Bayou was filled in at that time as practically as much as it is today, and hence could not have been then navigable.
 

 In their attempt to show that Bayou Sale was navigable in 1812, the defendants also introduced scientific and documentary evidence and the testimony of lay witnesses. It is the theory of defendants’ expert witnesses that Bayou Sale was an important, if not the principal, outlet of the Mississippi River to the sea; that it was formed only about 2,000 years ago and was used for several centuries. Due to the fact that the original bed of the bayou is covered by several feet of a fine grained substance known as muck, which plaintiff’s experts say is clay, they reason that the filling in of the bayou was originally of slow growth and that therefore the bayou remained as a navigable stream for a long .time. That it was not until it became choked with a deposit of ooze (or silt, as it is termed by
 
 *851
 
 plaintiff’s experts) that the bayou became nonnavigable at the site of the proposed oil well. Defendants’ experts say that the deposit of this ooze did not begin to accumulate until that part of the country was settled by people of European descent, which occurred about the year 1840. The experts claim that by cultivating the inner slopes of the natural levees at certain points along the Bayou, thereby facilitating the washing of the soil into the stream, by cutting trees and vegetation and by constructing dams across the stream, these immigrants from Europe created conditions which brought about an accumulation of the ooze, over a layer of muck as it exists today. As the experts claim it was only after the accumulation of a certain amount of this muck, a process which did not begin until about 1840, that the bayou became nonnavigable, they 'concluded that necessarily the bayou must have been navigable in 1812. One of defendant’s witnesses, a colored man named Marcel Babineaux, about seventy-four years old, who came to Bayou Sale in 1890, saw some small oyster boats in the bayou at the point designated on the Kidder map as the “gate”. The testimony shows that . the “gate” is located in the abandoned channel of the bayou approximately one and three-fourth miles above the mouth of the bayou and about four and one-quarter miles below the site of the proposed oil well. Aside from Babineaux, no witness recalled ever seeing a boat in Bayou Sale. Therefore, the testimony of Babineaux as to seeing some small boats in the bayou below the “gate” can have no bearing upon the question of the navigability of the bayou in 1812 at the location of the proposed oil well.
 

 In further support of their contention, defendants say that the bank of the bayou was once inhabited by Indians who abandoned their site when the water of the bayou became too salty for domestic use. Defendants place this event about 1200 to 1400 A. D. They attributed the increased salinity of the water to erosion, or washing away 'of the lower end of the stream at its mouth in East Cote Blanche Bay. They say that the water of the bay appeared in the bayou further upstream as its mouth was moved in the same direction and because of the erosion, the water in the bay being saline, eventually the water at the site of the Indian Village became unfit for domestic use.
 

 As the site of the Indian settlement was said to be about four miles distant from the location of the proposed oil well, it is stated that the salt water did not reach that location until some time subsequent to the year 1400 A. D. It is defendants’ theory that a considerable time after the Indians left the bayou the water therein flowed and ebbed, but as fossils, called haplophragmoides, which lived only in salt water, were found in the upper layer of the muck and below the ooze in the neighborhood of the oil well, it is defendants’ contention that salt water was reaching that point subsequent to the year 1400 A. D., and probably until the works of the European settlers destroyed the usability of the stream by causing the ooze to accumulate.
 

 Defendants assert that as fossils or planorbis, a fresh water shell fish, were found
 
 *853
 
 near the original bed of the stream, that is, at a greater depth in the deposit of muck, their theory of salt water encroachment is supported and the approximate rate of the filling of the channel of the bayou can be determined, as well as the approximate date of the change of the character of the fill in the channel. They say this is so because it is now possible to correlate the elevation of the then bayou bed to the time the Indians left the vicinity. They say they determined the date by inspecting the relics left by the Indians and comparing them with other relics of known age and by apT plying other generally accepted means of determining the period of Indian culture.
 

 Defendants attempt to give additional support to their theory by expert testimony regarding the distribution of vegetation along Bayou Sale. It was shown that in the lower portion of the bayou the vegetation was of the saline type or the type that is highly salt tolerant. Adjoining this portion of the bayou upstream, is vegetation that is not so salt tolerant and still farther upstream appears vegetation which is strictly fresh water vegetation. The opinion was expressed by defendants’ experts that the line of demarkation between fresh and salt water vegetation moved up the bayou with the encroachment of the salt water and that this process is still active and evident.
 

 The defendants further refer to the fact that certain bayous lying east of Bayou Sale have served similarly and have the same history, in that they all served as distributaries of the Mississippi-Teche, and all have been severed from the mother stream and are either all or practically all navigable today. The bayous which are thus compared with Bayou Sale are Bayous Du Large, Caillou, Terrebonne and Lafourche, which are still navigable. Inasmuch as the history of these bayous is younger than that of Bayou Sale by the period of time it required the Mississippi River to reach their locality in its steady progress eastward, after it left Bayou Sale, it is contended that these bayous today present a condition which probably existed in Bayou Sale after it became a non-functioning stream in the same number of years.
 

 As a matter of course, it is hardly necessary to observe that the parties to the suit vigorously challenge most of the theories and conclusions advanced by the opposing side.
 

 In evaluating the conflicting theories advanced by the experts for the respective parties, consideration must be given to the facts and inferences upon which the theories are based.
 

 It is not important to resolve the conflict of opinion among the experts as to the date when Bayou Sale was formed, nor the length of its active life in order to determine whether the Bayou was navigable in 1812. It is only necessary to consider the contention of the parties in connection with the severance of the Bayou from its parent stream. Dr. Russell was the principal expert for the defendants and the only one of their witnesses who expressed an opinion with respect to the navigability of Bayou Sale in 1812. According to Dr. Russell, the bayou was formed abo.ut 2,000 years ago and actually functioned for sev
 
 *855
 
 eral centuries before its severance from the parent stream began, requiring 50 to 100 years to complete. Thereafter the deposit of muck began to accumulate in the bed of the bayou, reaching a depth of six feet in about 1800 years, or in the middle of the Ninteenth Century. As a matter of fact, Dr. Russell fixes the year 1843 as the date when the accumulation of muck ended and the deposit of the so-called ooze began. The accumulation of ooze as visualized by Dr. Russell resulted chiefly from the disintegration of vegetation that grew in ponds situated above the ramps. Dr. Russell was of the opinion that Bayou Sale in 1843, when the accumulation of ooze began, was quite a large stream with a depth varying from 4 to 10 feet at various points. If the accumulation of ooze resulted mainly from the disintegration of vegetation growing in ponds above the ramps, it seems to be clear that the first decade or two should normally mark a period of slow accumulation increasing as time went along in proportion to the increased vegetation growing in the ponds. In these circumstances no appreciable amount of accumulation could normally be expected for a number of years, and it is difficult to understand how a stream which had ceased to function had accumulated only a small amount of soil deposit in its bed in 1800 years, and in the succeeding 40 to 50 years became practically choked up by deposits of vegetable matter and some inorganic substances.
 

 Dr. Glenn and Dr. Sellard, plaintiff’s experts, gave their opinions that Bayou Sale had become severed from its parent stream and had begun filling in more than 2,000 years' ago. They contend that the filling- in process was extremely rapid, requiring only from 100 to 300 years to complete it to the extent that exists today.
 

 Dr. Russell stated that the deposit of debris in the bayou was slow because no soil-laden water was introduced into the stream. On the other hand, Dr. Glenn and Dr. Sellard say that the deposit was rapid due to the washing away of the natural levees and the carrying of vegetation into the channel, and that because the flow of water had practically ceased these deposits accumulated rapidly. They support their contention by referring to the fact that trees which had lived to be almost 800 years old, as testified to by plaintiff’s expert,. Mr. Janes, had grown in the channel of the bayou and had died several centuries ago. These trees were cypress trees which do not germinate under water, and it is clear, therefore, that as far back as 800 years, or say the year 1200 A. D., there could be no navigation in Bayou Sale because of the lack of water. Mr. Janes testified that some of the trees in the bed of the bayou died at the ages of 775, 273, 408, 308 and 261 years respectively. It is not disputed that these trees could not have germinated under a sustained water coverage and, therefore, had to have an exposed soil surface to begin life. One of the exhibits in the record shows the location of the oldest tree found. The age of this tree at the time it died is fixed at 775 years. From the photograph it is possible to observe the lines forming the bed of the bayou before it filled in to any great extent and that the tree was practically in the center of the channel. This
 
 *857
 
 being so, the conclusion is irresistible that the bed of the bayou was exposed about the year 1200 A. D. This fact supports the contention of Dr. Glenn and Dr. Sellard as a whole and is opposed to defendants’ theory that there was a considerable depth of water in the channel of the bayou until the arrival of the immigrants from Europe in the middle of the Nineteenth Century.
 

 The location of the proposed oil well is about five miles farther downstream from the tree to which we have referred and, therefore, determining the nonnavigability of the bayou at the location of the tree as early as the year 1200 A. D., does not exactly determine its navigability at the location of the proposed oil well. But many other stumps were found in the bed of the bayou showing that the condition of the bed was uniform practically throughout its entire course. Another stump, the photograph of which is shown in the record, was excavated from the bed of the bayou some distance downstream from the site in dispute. The age of this tree, when it died, is estimated to have been 273 years. It must, therefore, be concluded that as long as 273 years ago, plus the time required for a cypress stump to deteriorate to the extent shown on the exhibit, the bed of Bayou Sale at a point downstream from the one .involved in this suit was exposed and the bayou was not susceptible of supporting navigation.
 

 It appears, therefore, to have been satisfactorily established that Bayou Sale was not navigable as early as the year 1200 A. D. at a point about five miles upstream from the site of the proposed oil well, and also that as early as 273 years ago, or about the year 1670 A. D., the hayou was not navigable for some distance downstream from the site of the proposed oil well. Therefore, there is a strong presumption that Bayou Sale was not navigable as late as the year 1812 at the place where the defendants are seeking to drill an oil well, which lies between those two points.
 

 The record also discloses that there are numerous living cypress trees and dead cypress stumps located well within the bed of Bayou Sale today. The bayou is about 19 miles long, and the trees comprise a seven and a half mile belt beginning at a point above the Intracoastal Canal and extending downstream to within three-fourths of a mile of the site of the proposed oil well. The ages of these trees, as determined by Mr. Janes, range from 158 to 200 years, and they extend to a point within approximately three-fourths of a mile upstream from the area in controversy. The stumps extend from above the Intracoastal Canal downstream as far as the Texaco Canal.
 

 In view of the fact that .streams generally develop harmoniously throughout their course, as shown by the testimony of Dr. Sellard, it is safe to conclude that Bayou Sale was not navigable in 1812 at the proposed site of defendants’ oil well. The conclusion is inevitable because it is based upon facts that are practically unassailable. The presence of living cypress trees in the bed of the bayou at the present time and of cypress stumps of ages greatly antedating the year 1812 in the channel of the
 
 *859
 
 stream, coupled wtih the undisputed fact that cypress trees can not begin growth under water, can lead to no other conclusion. Moreover, this conclusion is supported by the testimony of lay witnesses and the report of Cathcart and Hutton, to which we have hereinabove referred, with respect to the appearance, width and depth of the bayou in 1819.
 

 Each expert who testified on behalf of plaintiff made an independent investigation of Bayou Sale in his own particular scientific field and, based upon that investigation, expressed an opinion as to the navigability of Bayou Sale in 1812. Plaintiff’s expert witnesses who gave their opinions that Bayou Sale was not navigable in 1812 and for many centuries prior thereto, were: Mr. Janes, an ecologist; Mr. Kidder, a cadastral engineer; Dr. Penfound, an ecologist with particular scientific training in plant ecology; Dr. Glenn and Dr. Sellard, geologists. The experts who testified on behalf of defendants, in addition to Dr. Russell, geologist, were: Dr. Howe, a geologist; Mr. Cromer, a petroleum engineer; Dr. Dodson, a specialist in biology and geology; Dr. Brown, a botanist; Dr. Kniffen, an anthropologist, and Mr. Kemp-er, a civil engineer and surveyor. None of these witnesses, except Dr. Russell and Mr. Kemper, visited Bayou Sale and none of the witnesses, except Dr. Russell, expressed an opinion with respect to the navigability of Bayou Sale in 1812.
 

 Defendants’ theory, based on the testimony of'their witnesses, is subject to a certain margin of error and is therefore not convincing. For instance, the opinion is expressed by Dr. Kniffen that some time between the years 1200 and 1400 A. D. a large Indian Village existed on the right bank of Bayou Sale and that fresh water for the needs of this village was obtained from the bayou. According to Dr. Kniffen, the Indians abandoned this site some time during the above said period, probably for the reason that the water at the site had become too brackish to be used for drinking purposes. The testimony given by Dr. Brown concerning the vegetation along the bayou and its comparison with other streams and the testimony of Dr. Dodson concerning peat,, which testimony is disputed by plaintiff’s, witness, Dr. Penfound, is to some extent corroborative of the conclusion reached and expressed by Dr. Russell. But, as. stated by the trial judge in his lengthy and well-considered reasons for judgment,, the conclusion of Dr. Kniffen and Dr. Brown, taken together with the conclusion reached by Dr. Russell, form links in-a chain. After making this statement the trial judge comments thereon as follows:
 

 “This chain cannot be stronger than its weakest link. As some of these links are susceptible of a considerable margin of error, the whole chain is accordingly considerably weakened. One of the fundamental links is that the Indians’ departure from the section was between 1200 and 1400 A. D. and that it was caused by the introduction of salt water into the stream, which, in turn was caused by the erosion of the lower portion of the Bayou; and that the fresh water shell fish were fóund toward the bottom of the muck, or
 
 *861
 
 clay deposit, and the salt water shell fish were found toward the top of this deposit. The conclusion is offered, therefore, that in the years about 1200 to 1400 A. D. soil deposits in the stream had reached only to about the top level of the muck, and permitted enough water in the stream to support navigation until about the middle of the 1800’s when the works of the white man caused a change in the kind and rate of deposit.
 

 “The apparent weaknesses of this theory are two-fold: (1) Its effectiveness depends to a large extent upon the accuracy of the date when salt water was introduced into the stream at the proposed well site, and for this date the theory greatly depends upon Indian history and the study of their cultural-stages, which are admittedly inaccurate and susceptible of a considerable margin of error.
 

 “(2) The other step which is difficult to follow is, admitting the correctness of the first conclusion, then we find a stream that ceased to function, say, about 300 A. D. and until the middle of the 1800’s (over 1500 years) had accumulated only a small amount of soil deposits in its bed, but in the next forty (40) to fifty (50) years became practically choked up with deposits. The testimony of the lay witnesses is proof of the stream’s condition in the late 1800’s. Not only is this theory quite beyond the grasp of the lay mind, but it is also puzzling to one with scientific training.
 

 “Therefore, being shown in opposition to this latter theory, a more logical, complete and accurate one, the conclusion is inescapable that we must adhere to the one which is sounder. This is particularly so when it is supported by the other data given by Mr. Arthur D. Kidder relative to the physical evidence of the banks and the root crowns of the trees within the natural levees of the Bayou.
 

 “Mr. Kidder points out that there are no sharp marks in the soil of the levees of the Bayou, showing that a long period of time has elapsed since running water came in contact with them; as running water usually leaves sharp marks when it washes away soil. These marks generally disappear in time by the crumbling of the sharp edges, and the gentle and slow change in soil surfaces.
 

 “He also showed that the root crowns of old trees, that were living long before the year 1812, were still at or very near, the surface of the soil in the bed of the bayou. This could not be so if'the stream had filled in so much since 1812.”
 

 Defendants strongly rely on the theory advanced by their expert, Dr. Russell, that the navigability of Bayou Sale was adversely affected by the activities of the European settlers along the bayou in the year 1800 and succeeding years. Dr. Russell testified that the activities of these settlers, which brought about the change in the character of the fill from muck, clay or peat to ooze, consisted of cutting down trees, plowing lands, and, in particular, in upsetting the sedimentation of the bayou by building ramps and barriers across its channel. But there is no convincing evidence in the record of the facts on which the theory of Dr. Russell rests. He admit
 
 *863
 
 ted in his testimony that he was uncertain as to what extent people had moved in, cleared the land and plowed the fields in 1800. He gives as his understanding, without any proof of the facts on which the understanding is based, that the upper parts of the bayou were settled, cleared and put into agriculture sometime prior to the effective settlement and cultivation generally in the region downstream. But when the effective settlement referred to by Dr. Russell occurred downstream is not shown and his testimony in regard thereto is too speculative and uncertain to be of any probative value.
 

 It is difficult to understand why the settlers from Europe would construct ramps and barriers across the channel of a navigable stream which obviously furnished their only possible method of transportation at a time when there were no railroads, highways or other means for the movement of persons, materials, provisions or supplies. If the settlers from Europe actually destroyed or impeded the navigability of a stream on which they were almost wholly dependent in conducting their normal, social and business activities, they obviously acted in a manner contrary to what was done elsewhere. But defendants’ theory is not supported by tradition nor historical data and is opposed to certain well-known physical facts.
 

 The experts for both parties agreed that Bayou Sale was severed from its parent stream about 1800 years ago. It follows, therefore, that during the next succeeding centuries the bayou fell into the category of an abandoned stream. It is undisputed that after a stream abandons its channel, deterioration rapidly sets in. In one of his recent publications entitled “Louisiana Stream Patterns,” Dr. Russell himself says: “Every straight channel in the lower delta of Mississippi River is either an active or relict main river channel, important distributary, or pass. Every Channel of this type has natural levees which rise above the levels of surrounding marsh and effectively prevent tributary inflow. * * Lacking tributaries, such channels deteriorate rapidly when abandoned.”
 

 In an article entitled “Physiography of Lower Mississippi River Delta,” Dr. Russell again wrote: “It is quite generally true in the marshes that the significant channels deteriorate rapidly after abandonment because of ■ isolation caused by their levees.”
 

 Dr. Sellard and Dr. Glenn, plaintiff’s experts, concur in the views expressed by Dr. Russell that after a distributary is severed from the parent stream, deterioration therein takes place rapidly.
 

 In view of the admitted fact that abandoned channels deteriorate rapidly, it is difficult, and in fact it is impossible, to accept as correct defendants’ theory that after the expiration of a period of about 1700 years Bayou Sale existed as a large-navigable stream with widths varying from 100 to ISO feet and with a depth varying from four to ten feet. If the clay deposits revealed by the numerous cross-sections in varying thicknesses of four, six and nine feet represent the total of channel fill accumulated over a period of 1700 years, it
 
 *865
 
 certainly can not be said that the rate of such channel fill falls within the category of rapid channel deterioration.
 

 Another reason why it would appear that the European settlers were not responsible for the accumulation of that portion of the fill in the channel of Bayou Sale, which is referred to as ooze, is that, as shown by the evidence, the bed of the bayou had subsided or become submerged many feet within the 1800 years elapsing from the date of its severance from the parent stream. The subsidence of the channel of Bayou Sale and the filling of the channel largely by organic matter derived chiefly from Sagittaria and various grasses, according to the experts, has been going on for approximately 2000 years. The large exposed cypress stump located in the channel of Bayou Sale where it intersects the Intracoastal Canal was uncovered by dredging the canal. Its root crown today stands below mean Gulf level and before it was uncovered it was submerged below the bed of the bayou. To the right of this large stump and standing in water in the Intracoastal Canal in the bed of the bayou is another exposed but formerly submerged cypress stump with its root crown likewise far below mean Gulf level. There are other cypress stumps in the bed of the bayou exposed to view at low tide at a point where the Texaco intersects Bayou Sale near its mouth. These stumps were viewed and testimony given in regard thereto by plaintiff’s experts, Mr. Janes, Dr. Sellard and Dr. Glenn. These and other submerged cypress stumps were found in the center of the bed of Bayou Sale and strongly indicate that the subsidence of the bayou took place many centuries ago as shown by the ages of the stumps as of the date of the death of the trees. From all of which it clearly appears that the sedimentation of Bayou Sale was upset many years prior to the arrival of the European settlers and their activities on the natural levees of the bayou.
 

 Our conclusion is that plaintiff’s contention that Bayou Sale was not a navigable stream in 1812, when Louisiana was admitted into the Union, is sustained by a preponderance of the evidence, and, consequently, the judgment rendered by the district court in plaintiff’s favor is correct.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 O’NIELL, C. J., does not take part.