## No. 6707.

### LORD CECIL ET AL. VS. THE BOARD OF LIQUIDATION.

Bonds of the State which are described by the Supplemental Funding Act of 1875 as "questioned and doubtful," can not be legally funded by the Board of Liquidation until they have been scrutinized, and declared valid by this court.,

Although such bonds be negotiable in form, and have passed into the hands of innocent third persons, who have purchased them in open market, before their maturity, and for a valuable consideration, they nevertheless will not be a valid debt of the State, unless their holders prove that they were issued in accordance with law. The rule of the commercial law in favor of the holders of ordinary negotiable paper, is not applicable to such bonds.

Lord Cecil et al. vs. the Board of Liquidation.

The bonds of the State issued in favor of the "Bœuf and Crocodile Navigation Company," were not issued in conformity to law, as obviously appeared from the Act authorizing their issue, printed on the reverse sides of the bonds; and therefore are not binding obligations of the State.

The act of the Legislature passed in 1877, which gives to the Third District Court of the parish of Orleans, in certain enumerated cases, concurrent jurisdiction with the Fourth, Fifth, and Sixth District Courts of said parish, is not in violation of any provision of the State constitution.

A PPEAL from the Third District Court, parish of Orleans. *Monroe*, J.

*Clarke, Bayne & Renshaw* for plaintiffs.

*B. F. Jonas* for intervenors.

*H. N. Ogden*, Attorney General, for defendants and appellants.

The opinion of the court was delivered by

MANNING, C. J. Lord Eustace Cecil, George Montague Sandford, George Woodhouse Currie, and Sir Philip Rose, as trustees of the Foreign and Colonial Government Trust in England, purchased thirty-eight bonds, of one thousand dollars each, of the State of Louisiana, which had been issued under an act of the General Assembly of this State approved January 3 1870. Upon presenting these bonds to the Board of Liquidation to be funded, they were refused because the bonds were issued in aid of the Bœuf and Crocodile Navigation Company, and all the bonds of that issue had been declared of doubtful validity by the supplemental Funding Act. This act prohibits the Board of Liquidation from funding any bonds mentioned in this *liste des proscrits* until they have been declared by this court to be legal and valid obligations of this State, and that they were issued in strict conformity to law, and not in violation of the constitution of this State or of the United States, and for a valid consideration. Acts 1875 p. 110. Thereupon the plaintiffs instituted this suit for the purpose of obtaining from this court a decree affirming the legality and validity of the bonds in question.

L. B. Bimse of New York intervened, claiming ownership of fifteen other bonds of same denomination and issue, alleging a like presentation of his bonds for funding and a like refusal, and praying a like decree. An intervention of this kind seems to be sanctioned by the act, and no objection is made to it.

The defendant answered by a general denial, and a special averment that the bonds held by plaintiffs had none of the characteristics required by the supplemental Funding Act. The answer to the intervention is the same in substance. There was judgment in favor of the plaintiffs and intervenor, and the defendant appeals.

It will be observed that the object of this and similar suits is not to obtain a judgment against the State for the amount of the bonds. The decree we are to render is assimilated to a special verdict of a jury,

who have been charged to ascertain or find certain facts, i. e. do the bonds possess the requisites, enumerated in the act of 1875, which it is essential they should have in order to justify the Board of Liquidation in funding them.

The General Assembly passed an act granting the aid of the State to the Bœuf and Crocodile Navigation Company, by which the Governor was authorized to issue the bonds of the State to the amount of eighty thousand dollars in favor of that company. It empowered the president and secretary of the company to sell or pledge the bonds thus issued in such quantities as they may deem necessary to raise money for the completion of the work of making the Bœuf and Crocodile navigable. Whether the two things designated by these two words were canals, or bayous, or streamlets, or larger bodies of water nowhere appears in the act, which provides further that all the rights and privileges of the company are pledged, hypothecated, and mortgaged to the State to secure the payment of the bonds issued in its aid, and the interest that may accrue thereon. Acts 1870 p. 21.

· The bonds have at their head the words, " State bond in favor of the Bœuf and Crocodile Navigation Company," and run thus, " the State of Louisiana is indebted to Henry C. Warmoth or bearer in the sum of one thousand dollars" etc., and bear even date with the act above quoted, and are signed " H. C. Warmoth, Governor of the State of Louisiana," and are countersigned by the Secretary of State. It is admitted that the signer of the bonds is also the payee.

The testimony of all the plaintiffs was taken, from which it appears they bought thirty-eight of these bonds in London on the 8th of April 1870, three months after their date, and paid for them £6461 1s. 10d. a sum exceeding that at which they can now fund them in Louisiana consols. The intervenor's testimony is that he paid nine hundred and twenty dollars flat for each of his fifteen bonds, in open market at New York, on the 1st of April of same year. These holders now charge that being purchasers in good faith, before maturity, and for a valuable consideration, in open market, they are protected by the undisputed rule of commercial law which shelters them from all latent equities between the maker and the payee—that they had not to look further than or behind the broad seal of the State, which assured them of the genuineness and legality and validity of the securities thus purchased.

If this rule of commercial law is applicable without reserve to the bonds of this State, what significance are we to attach to the act of 1875 ? The Funding Act provided that all obligations of the State might be exchanged for consolidated bonds at the rate of sixty cents on the dollar, and constituted a board to liquidate these obligations, and gave to the holder of any valid bond or warrant, in case of its rejection by

the board, the right to apply to any proper court for relief. Acts 1874, p. 39. In the following year, the supplemental Funding Act enumerated bonds, amounting to over fourteen millions of dollars, which it declared 'questioned and doubtful as to their legality and validity,' and expressly and in terms prohibited the board from funding any of the bonds on that list until this court had decreed that they were valid obligations, and that they had been issued in conformity to law, and for a valid consideration.

If the holders of these 'questioned' bonds, who are purchasers before maturity for a valuable consideration, are entitled to have their bonds funded because they thus purchased them, why should the General Assembly impose upon them the vain and useless formality of obtaining a decree from this court upon any quality of the bonds? Of what avail is an inquiry touching the validity of a bond, or its issuance in conformity to law, if the fact that it is invalid and that it was not issued in conformity to law, will not affect the rights of the holder? Clearly this rule of commercial law does not apply here. The State can be sued in her own courts only by her permission, and in the manner and for the purposes indicated by her. The supplemental funding act required parties who resort to an action against her, through the board of liquidation, to establish the good consideration, and valid issue in conformity to law, of the bonds offered for funding, and restricted this court to an ascertainment of the possession of these requisites by those bonds. It is that law therefore that must be our guide, and not the general commercial law, in actions like the present. We have a substantial inquiry to make. The holders of these 'questioned' bonds must shew affirmatively that they have all of the requisites recited in the act of 1875 as necessary to obtain a decree of this court. One of these is that they must be issued in conformity to law. Were these bonds thus issued?

The act from which they derive their existence reads, "that the Governor is hereby authorized to issue in favor of the Bœuf and Crocodile Navigation Company, domiciled in the parish of St. Landry, State of Louisiana, the bonds of the State to the amount of eighty thousand dollars." The bonds were not thus issued. They are payable to H. C. Warmoth or bearer. The act provides that the president and secretary of the company shall have power to sell or pledge the bonds, but neither of these officers is made the payee for the company, but they are signed by the Governor in his official capacity and are payable to him in his individual capacity.

It would be difficult to imagine a case where the parties would be more entitled to equitable relief than this. Their good faith is unquestioned. The English holders purchased for a trust fund. They

invested in these bonds, relying upon the good faith of the State, whose seal attested their genuineness, and we are asked, not unreasonably, to assist in upholding that faith and credit. But we are not the law-making department of the State. The policy or impolicy, the good or bad faith, of an enactment such as the Funding bill of 1874 is now beyond our inquiry. Too many and too grave complications would now ensue from the opening of that question. But the act of 1875 emanated from the same source, and that Act imposes upon us the duty and the necessity of ascertaining whether any of the bonds enumerated in it are wanting in any of the qualities, essential to entitle them to be funded. We think the bonds of the plaintiffs and intervenors are wanting in one of them. They were not issued in conformity to law. And the lack of this quality was patent.

The Act which authorized the issuance of the bonds is printed in full on the reverse of each bond. Each purchaser, when the bond was offered to him, could read for himself the conditions and form prescribed by the act. If a more minute examination was made, he would fail to discover from the terms of the Act what it was that the Legislature of Louisiana was intending to improve. The term 'navigation' would certainly imply that water was the element to be operated on, but there is no indication beyond that. The Act bore on its frontlet unmistakably the warning, *caveat emptor*.

The judgment from which this appeal was taken was rendered by the Third District Court of this city. It is now contended on behalf of the defendant that the matter in controversy was without the jurisdiction of that court. It derives that jurisdiction from an act of the present year. Acts 1877, p. 218. The Attorney General attacks the constitutionality of that Act.

The Constitution confers upon the General Assembly the power to establish as many District courts in the parish of Orleans as the public interest may require. Until otherwise provided, seven are constituted, and to the third is given exclusive jurisdiction of appeals from justices of the peace. These seven courts shall also have such further jurisdiction, not inconsistent herewith, as shall be conferred by law. article 83. It is not inconsistent to enlarge the jurisdiction of one of these courts. The third Court must have exclusive jurisdiction of appeals from justices of the peace, but this exclusive jurisdiction of a particular class of cases does not preclude it from having concurrent jurisdiction with other courts of another class. The division or assignment of jurisdiction made in the constitution must remain until otherwise provided, and the use of this phrase implies that another assignment may be made. The legislature has given to the third Court original concurrent jurisdic-

Lord Cecil et al. vs. the Board of Liquidation.

tion with the fourth, fifth, and sixth, in certain cases, and this is one of them.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court is avoided and reversed, and it is now decreed that the bonds held by the plaintiffs and intervenor are not valid obligations of the State of Louisiana, and that they were not issued in conformity to law. It is further ordered that these parties pay the costs of both courts.

Rehearing refused.

## Concurring Opinion.

Marr, J. There are certain considerations affecting the validity of the bonds in question in this case to which I attach much importance; and which I desire to state more distinctly than my brethren have done in the several opinions prepared by them.

The law relating to commercial paper, bills of exchange, and promissory notes, by which the innocent holder, for value, before maturity, is protected against equities and defenses which might have been available between the original contracting parties, is not applicable to the holders of State bonds or municipal bonds. Every one who purchases such bonds knows that they purport to have been issued in virtue of delegated authority; and that their validity, as obligations of the State or of the municipal corporation, depends upon the nature and extent of the power granted by law.

In Wilson vs. City of Shreveport, 29 An. 678, we had occasion to consider this subject with reference to bonds issued by the municipal authorities of Shreveport; and the views we expressed in that case are equally applicable to bonds issued by the State:

" Those who contract with municipal corporations know that these bodies act validly only within the powers conferred upon them by the special laws by which they are created; and the creditor of a corporation is bound to see that the contract or obligation of which he claims the benefit is within the power which the corporation may lawfully exercise. The fact that the obligation is in the shape of a negotiable instrument, or that it was acquired in good faith for a valuable consideration, before maturity, in no manner enlarges the power of the corporation, or gives any additional force or validity to its unauthorized acts."

It is a great mistake to suppose that the State governments have unlimited power to tax the property of the inhabitants.

In an argument of great force, Mr. Justice Miller, delivering the opinion of the Supreme Court of the United States, in the Loan Asso-

ciation vs. Topeka, 20 Wallace, 658, demonstrates that all our governments, State and national, in all their departments and branches, are of limited and defined powers. At page 664, he uses this strong language with respect to taxation in aid of private enterprises :

"To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises, and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms."

The suit was on bonds issued by the city of Topeka, in aid of a manufacturing company, in virtue of an act of the legislature of Kansas. The difference between that case and this is, that the bonds were issued by a municipal corporation; and that they were a donation to the company. But if a municipal corporation, under the authority of an act of the legislature could not validly exercise this power, it is simply because the legislature itself had not such power, and, therefore, could confer no such power upon the municipal corporation. And, if it is not lawful to make such a donation in aid of private enterprises, it is equally unlawful to lend the bonds of the State, in aid of such enterprises, to be paid by taxation, as principal and interest become exigible. This is certainly a donation of the use of the money, and of the interest on the sums so advanced. It is compelling the citizens to contribute annually, not for the use of the State, but for the use and benefit of the favored individuals, whose private fortunes are thus built up at the expense of the taxpayers.

Justice Miller lays down the proposition, and demonstrates it, that there can be no lawful tax which is not laid for a public purpose.

Interest had been paid on these bonds; but no importance was attached to that fact, since the payment of the interest was equally unauthorized as was the issuing of the bonds.

Looking into the history of this Bœuf and Crocodile Navigation Company, it will be seen that, in February, 1867, certain individuals in the parish of St. Landry, by notarial act, organized themselves as a corporation, for the purpose of improving the navigation of these bayous; and shortly after the legislature passed an act recognizing this company, and granting it the right to navigate these bayous; to charge certain freight; and to collect tolls at the rate of $2 50 a ton on steamboats, and $1 50 a ton on other water craft, employed by others in navigating these waters, thus creating a monopoly in favor of this company. Among other extraordinary privileges granted to this company was the exemption of its property and franchises from taxation for ten years; so that the other citizens of the State were not only to be taxed to complete this work,

but were to have their annual burdens increased for ten years, up to the taxable value of the property of this favored company thus exempted. See the act of 1867, No. 171, p. 315, approved twenty-eighth March.

There is another, and a fatal objection to these bonds, which, of itself alone, made them void *ab initio.* The constitution of Louisiana, article 111, provides that—

" Whenever the General Assembly shall contract a debt exceeding in amount the sum of one hundred thousand dollars, unless in case of war to repel invasion or suppress insurrection, it shall, in the law creating the debt, provide adequate ways and means for the payment of the current interest and of the principal, when the same shall become due; and the said law shall be irrepealable until principal and interest be fully paid; or, unless the repealing law contain some adequate provision for the payment of the principal and interest of the debt."

The State has no means of paying its debts except by taxation; and the power of the legislature to raise, by taxation, whatever amount may be necessary for the legitimate debts of the State, can not be questioned. The plain meaning of this article 111 is that when the means of the State are anticipated by the contracting of a debt exceeding one hundred thousand dollars, some other ways and means, beyond the ordinary taxes for ordinary purposes, adequate for the payment of the principal and interest, shall be specially provided, appropriated, and set apart for that specific purpose; and, in order to preserve the good faith and credit of the State inviolate, the provision thus made contemporaneously with the contracting of the debt, is placed beyond the legislative power of repeal. It would be a waste of words to enlarge upon the wisdom of this constitutional restriction; but it is not out of place to say, that if it had been faithfully observed, the credit of the State could not have been abused to any great extent; the markets of the world would not have been flooded with its bonds; and strangers, trusting to the honor and integrity of the State, and the assurance of its broad seal, would not have invested their means in these deceptive, unauthorized, illegal, worthless securities.

Turning now to the act approved January 3, 1870, pages 21, 22, we find that it authorized the issue of bonds of the State to the amount of eighty thousand dollars, payable twenty years after date, bearing interest at eight per cent, each bond to be for $1000, with forty bonds for forty dollars each attached, representing the interest to be paid semi-annually. That is, the principal of the debt thus contracted was $80,000, and the interest $128,000, making the whole debt thus contracted $208,000. The article of the constitution makes no distinction between the principal and the interest; indeed, it expressly characterizes both as constituting the debt, of which each is merely a separate

part. The expression used in the article, "the principal and interest of the debt," is conclusive; and it is not possible to call the principal sum a debt without characterizing also as a debt the interest on that sum stipulated in the same contract. The debt therefore thus created did exceed $100,000; and it falls within the terms of this article of the constitution.

The act creating this debt does not provide adequate ways and means for the payment either of the current interest or of the principal. It does, indeed, declare, section 3, that all the rights and privileges of the Bœuf and Crocodile Navigation Company are pledged, hypothecated, and specially mortgaged to the State; but the object of this is to secure the refunding, by the company, to the State, at the expiration of the twenty years, "all the sums of money paid by the State upon said bonds," as provided in section 4.

Obviously, therefore, the State undertook to advance and pay, in principal and interest, $208,000 to the holders of these bonds; and in the act creating this debt no provision whatever is made for the means of paying either the principal or the interest.

Of what value is the declaration, in this act, that the rights and privileges of this company are pledged, hypothecated and specially mortgaged to the State? Of what value were these rights and privileges? What will be their value at the expiration of the twenty years?

But if this security had been sufficient to indemnify the State, what provision is made in the act of adequate ways and means to enable the State to pay one single dollar of this debt to the holders of the bonds? Absolutely none. The legislature simply ignored article 111 of the constitution, and violated its positive injunction. There can be but one consequence; it is inevitable. The act was *ultra vires*, and is void; and the bonds, having been issued without authority of law; in violation of the organic law, are absolutely void, and impose no obligation, legal or moral, on the State.

I concur in the decree just pronounced.

---

### CONCURRING OPINION.

DeBlanc, J. Under act No. 46 of the Legislature of the State of Louisiana, approved on the 3d of January 1870, the Governor of said State was authorized to issue—*in favor of the Bœuf and Crocodile Navigation Company*, domiciled in the parish of St. Landry, the bonds referred to in said act.

To whom were said bonds to be delivered? By whom alone could they have been either sold or pledged? They could have been properly

delivered but to the company in whose favor they were to be issued, and that company could have legally disposed of them but for one object: to raise money for the completion of the work necessary to secure the navigation of the Bœuf and Crocodile.

How and by whom was that money to be raised? In such quantities as would be deemed necessary, and by the President and Secretary of the company.

Instead of issuing those bonds in favor of the company, what was done? They were made payable to Henry Clay Warmoth, then Governor of the State, or bearer. In that form, they passed to the applicants, who claim that—under act No. 11 of the extra session of 1875, they have the right to compel the Board of liquidation to exchange them for consolidated bonds. In that form, they are not the bonds authorized by the statute of 1870—and, as remarked by the Chief Justice, that fact could have been ascertained by reading the law published on the back of every instrument they hold.

Did the company receive those bonds, and did they pass—by transfer or otherwise—from the company to any one? That may be, but those facts are not shown. The actual bearers took them before maturity, and—in their opinion—by whom and howsoever their transfer was effected—were it by one who acted with or without a mandate from the company—the delivery of the bonds, and the payment made by them to those by whom they were delivered, preclude the State from contesting their validity.

Were these questions presented by either the demand or the defence, we would certainly hesitate to adopt the second conclusion—but they are not presented. We are called upon—under a special act—to declare, not whether the bonds were taken on good faith and before maturity—not whether in an authorized suit brought to recover from the State the amount of those obligations, the State would be cast—but whether, under the provisions of the act relied upon by plaintiffs, the obligations so transferred to them shall be exchanged for consolidated bonds?

Had these bonds been made payable to the company, and, in that form, had passed to third parties, they might have carried, on their face, the presumption that they had been delivered to, received and disposed of by those who alone had the right to sell, pledge and transfer them. Stripped of that presumption, they do not bear in themselves the evidence that they were issued, delivered and disposed of in accordance with the law. If they were, to non-bond the State towards the holders, to bond the company towards the State, those facts must be legally established.

I concur in the opinion read by the Chief Justice.

Lord Cecil et al. vs. the Board of Liquidation.

### CONCURRING OPINION.

EGAN, J.     I attach more importance than seems to have been accorded to it to the fact that the bonds which are sought to be funded present the very novel peculiarity of having been executed by H. C. Warmoth, *Governor*, in favor of H. C. Warmoth, *individually*, or bearer.   In my opinion, this can not be treated as surplusage in so large and important a transaction and one involving the faithful discharge of a public trust.   It may be that no wrong was done or intended by this. It is, however, one of those acts which come under the head of constructive fraud, and one violative of the general rule which prevails not only in America but in England, and in all enlightened countries and of which the plaintiffs could not have been ignorant when they purchased these bonds—that "a trustee is bound not to do any thing which can place him in a position inconsistent with the interests of the trust, or which has a tendency to interfere with his duty in discharging it;" that an agent can not dispose of the property of the principal to himself, nor execute in his own favor obligations in the name of his principal.   In like manner that all agreements or obligations which are founded upon violations of public trust and confidence or of the rules adopted by courts in furtherance of the administration of public justice are held void, and that, too, whether fraud or a violation of trust public or private actually exists in the particular case or not.   That eminent jurist and writer, the late Judge Story, announces these principles with great clearness and cogency in his Equity Jurisprudence, and so do all the standard works.   Such is the settled jurisprudence of this State, the obligations of which especially rest upon us as administrators of its laws. It is, however, needless to cite authority in support of maxims so well founded and of so universal recognition ; and nowhere to a greater extent than in Great Britain and New York, where the plaintiffs and intervenor acquired the bonds in question.   This case bears no similitude to the execution by an individual to his own order or to himself or bearer of a note or negotiable instrument designed to be put upon the market. H. C. Warmoth, Governor, and H. C. Warmoth, the individual, are not one and the same entity.   H. C. Warmoth could not, as Governor, make or sign any valid or binding obligation of the State payable to himself individually.

It will be understood that the subject we are discussing has nothing to do with the particular motives for the particular act of which no evidence is before us; we are simply dealing with the law which governs all such acts, *whether well or ill intentioned,* and the public policy which makes such law necessary.   As has been very properly remarked by the Chief Justice, we are now acting under and solely in obedience to a statute

which requires us to find or adjudge the existence of certain facts which are made by the statute a pre-requisite to the funding of obligations of the class now under review. Among these facts are the important ones whether they were issued in accordance with law and are valid obligations of the State. With this finding it has been well stated the rules of law which give currency and credit to ordinary negotiable instruments for ordinary purposes have nothing to do. If it did, however, who will say that even according to the strictest rules of commercial law the holder or purchaser is not to be affected by what it bears upon its face? and even were the law and public policy which dictates it less imperative is there not enough in the unusual manner in which these instruments are drawn to put any purchaser upon inquiry at least and to give as to them double force to the principle of "*caveat emptor ?*" But this is not all. The act which is printed upon the back of the bonds not only provides that the bonds shall be issued to the Bœuf and Crocodile Navigation Company, by its very terms, and that only so much of them as may be necessary to carry on the work shall be put in circulation by the president and secretary, (of which fact these bonds bear no evidence whatever,) but it goes farther, and provides that all the rights, franchises, and property of the company *shall be mortgaged* to the State to secure the payment of the bonds issued under it, and the re-imbursement of any amounts which the State may have to pay by reason of the issue. Now the act itself makes no provision for the making or retaining of this mortgage *in any special or unusual manner;* and it must therefore be interpreted to mean that this must be done in the usual way by the execution of an instrument *at least in writing,* if not by public act, see La. Civil Code, art. 3305, as no valid mortgage can under our law be otherwise executed or retained. And not only is this true, but it was beyond the power of the Legislature had it even attempted it in express terms (as it did not) to provide for the retention of a mortgage *to affect third persons* and to give to the State and to its paper the security contemplated by the act, without not only the writing but the recording in the proper office or offices of registry and in the proper manner of the act or instrument of mortgage. Art. 123 of the State Constitution provides that "no mortgage or privilege shall hereafter affect third parties unless *recorded* in the parish where the property to be affected is situated." La. Civil Code, arts. 3342, 3345, 3347. 3348 make similar provision.

Again, conventional mortgages can only be agreed to by those who have the power of alienating the property which they subject to them. C. C. of La. art. 3300. Again, to render a conventional mortgage valid it is necessary that the act establishing it shall state precisely the nature and situation of each of the immovables upon which the mortgage is granted. La. Civil Code, art. 3306. Do not all these provisions of the

constitution and laws of the State, of which the Legislature was and must have been cognizant, furnish additional evidence that the Legislature contemplated the issuance of these bonds *to the Company itself*, which alone, through its authorized officers, could grant a mortgage upon its property, and as we have seen it must be first granted before it could be recorded, and must be recorded to affect third persons or to furnish any security to the State such as the act expressly stipulated. · The legislative act was the letter of attorney of its officers in the premises. They had no power or authority to act or bind the State otherwise than as provided in the act. If, therefore, the Governor chose to issue these bonds to himself or to any other person or corporation than the Bœuf and Crocodile Navigation Co. he acted in so doing without authority and thereby created no valid obligation of the State. It is also true that the act does not contemplate that the State authorities shall put these bonds upon the market. That power and duty are specially confined to the President and Secretary of the Company as the work may require. Every purchaser who deals in State securities is at least required to know the law which provides for their issuance.

For these additional reasons I concur in the decree.

### Concurring Opinion.

Spencer, J. The State by the funding act declared its willingness to fund its outstanding obligations at sixty cents on the dollar, and organized the Board of Liquidation to carry into effect its provisions.

By act No. 11 of 1875, known as the Supplemental Funding Act, it declared that there were certain series of its obligations (among which are named those held by plaintiffs and intervenor), which were of doubtful legality, and it forbade said board to fund them, until the decree of this court had been obtained, declaring that they were legal and valid debts of the State, contracted in pursuance of its constitution, for a valid consideration and issued in strict conformity to law.

A State can be sued only by its own consent, and it may therefore impose such limitations and restrictions on the right of suit as it pleases. Hence this court, in determining its powers and duties in cases against the State, must look to the act authorizing the same, in order to determine the scope and limitation of its power and jurisdiction. Outside of the act authorizing the suit, and beyond the limitations therein fixed, it is absolutely without authority to hear and determine; and must therefore confine its investigations within the limits and to the objects specified.

Act No. 11 charges us to investigate, first, the constitutionality of

the act under which the bonds held by plaintiffs were issued—second, whether, if the said act be constitutional, said bonds were issued in strict conformity to its provision—third, whether there was a good and valid consideration to the State for the bonds.

We are required to investigate each and all of these questions, and to report by decree the results of that investigation. It is manifest, therefore, that the accepted rules of the commercial law are not the sole, or indeed the controlling, guides for our investigations. *That law forbids* all inquiry *into the consideration* of. negotiable paper, when in the hands of *bona fide* holders for value and before maturity, as in this case. Whereas, act No. 11, which is the charter by virtue of which we have any authority in this case, declares that *we shall go into that* inquiry and *specifically* charges us with it! Which law shall we obey? Which law shall govern us? Certainly the act No. 11—for if *that* is not to govern us—if its injunctions are to be ignored, we are without authority to hear this cause at all. Any decision we would render would be *coram non judice.*

I do not think that the act No. 11 in any way changes the laws of evidence. The facts in controversy before us may be proved by any lawful evidence, direct or presumptive, oral or written.

It is also clear that this court is not by said act vested with power to render judgment against the State for any sum of money—but we are directed, as it were, to render *a special verdict*—to find the existence or non-existence of certain facts and conditions relative to said bonds; and according as we shall find them to exist or not exist, the State directs that the board shall act. Our jurisdiction is extended and limited to these inquiries. We can not go beyond them, nor stop short of them, without disregarding the law under which we are authorized to act. If we find any one of the conditions specified by the law to be wanting in these bonds, it will be our duty so to declare, and it will. then be the duty of the board not to fund them.

I therefore address myself to the inquiries submitted to us by the statute, to wit:

First—Is the law under which the bonds were issued violative of the constitution of this State or of the United States?

Second—Were the bonds issued in strict conformity to the law authorizing their issue?

Third—Did the State receive a good and valid consideration therefor?

As the first of these questions was not raised in argument or pressed I pass it.

The second point has been especially contested, and in my opinion is the one upon which the plaintiffs' rights must stand or fall.

The act of the legislature granting aid to the Bœuf and Crocodile Navigation Company, directs in substance, by its first section, that $80,000 of bonds of the State shall be issued " *in favor of* " the said company. By its second section the president and secretary of said company are authorized to sell or pledge the said bonds so issued. By its third section it stipulates and reserves a mortgage in favor of the State upon all the property, rights and franchises of the said company to secure the payment of said bonds, and the reimbursement of any amounts the State may have to pay on account thereof.

The bonds held by plaintiffs, and said to have been issued under said act, are made payable " to H. C. Warmoth or bearer." There is a caption to the bonds as follows: "Bonds of the State of Louisiana." " Issued in favor of the Bœuf and Crocodile Navigation Company." Plaintiffs contend that this is a substantial compliance with the directions of the statute, and that the bonds being made payable " to H. C. Warmoth or bearer" is immaterial, since they bear upon their face the statement that they were issued in favor of the company. Unless good reasons can be assigned to the contrary I should be disposed to accept this view. But I think such reasons exist. The State was, in effect, loaning or rather proposing to loan its bonds to the company upon certain terms and conditions; which were that the company should pay the bonds when due, and re-imburse the State any sums it might pay on account thereof—these obligations of the company to be secured by a mortgage on its property and franchises. The company was only to sell or use so much of the bonds as were necessary for the contemplated improvements, and such bonds as were sold or pledged were to be so sold or pledged by its president and secretary. This offer to loan by the State was clearly incohate and incomplete until accepted by the company, of which acceptance we have no proof in this record. The company could only be bound to pay said bonds, and to re-imburse the State if it paid them, and by the stipulated mortgage, in the event, and to the extent, the corporation accepted, received and used the bonds. It therefore became a matter of importance that these bonds should not be given out, except upon such terms and under such circumstances as would insure the liability of the company for their payment or re-imbursement, and make effective the mortgage of the State. It seems to me therefore that an important purpose was contemplated and to be attained, in requiring the bonds to be issued *in favor of the* company, and in specifying the officers of the company who should negotiate them. It was a means of fixing the liability of the company. If the bonds had been made payable to the company, they could not have been sold or pledged, except by the indorsement of the company by its president and secretary. I take it that the words " in favor of " used

Lord Cecil et al. vs. the Board of Liquidation.

in this statute must be taken in their usual and ordinary signification, which is synonymous with "payable to." When we speak of a note being given "in favor of" a person, we mean and are understood to say that it *is payable to him.* I think that the act contemplated and required that these bonds should be made payable to the company, and that there was a good reason and purpose in so requiring. As the bonds were in fact issued, *i. e.*, payable to Warmoth or bearer, the company could, (and if solvent,) no doubt would dispute successfully its liability to the State, by denying that it ever received or disposed of them. I therefore think there was a fatal variance between the bonds as issued and the statute authorizing their issue, and that therefore they were not issued "in strict conformity to the law." I prefer to rest my concurrence upon this ground.

I concur in the decree of the court in this case.