34 So.2d 331

**JEFFERSON LAKE SULPHUR CO., Inc.
v. STATE.
No. 38490.**

Dec. 15, 1947.

Rehearing Denied Feb. 16, 1948.

Fred S. LeBlanc, Atty. Gen., W. C. Perrault, First Asst. Atty. Gen., and Robert R. Reid, Second Asst. Atty. Gen., for the State, defendant-appellant.

E. Howard McCaleb, Yarrut & Fishman, O'Niell & O'Niell and Eugene H. Walet, Jr., all of New Orleans, for plaintiff-appellee.

JANVIER, Justice ad hoc.

As a result of the decree rendered by this Court on July 1, 1935, in the matter entitled State of Louisiana v. Jefferson Island Salt Mining Co., Inc., 183 La. 304, 163 So. 145, the State of Louisiana, on March 30, 1936, recovered from the said Salt Mining Company $1,427,826.51. That suit originated in the Sixteenth Judicial District Court for the Parish of Iberia. This amount was recovered because, as was held in that case, the said Company had illegally mined and removed from beneath the bed of Lake Peigneur in Iberia Parish certain quantities of salt and had sold that salt, although the bed of said lake was the property of the State of Louisiana.

The present suit is brought against the State of Louisiana by the Jefferson Lake Sulphur Company, Inc.,—in no way connected or identified with Jefferson Island Salt Mining Co., Inc.,—for the recovery of what the said plaintiff corporation claims is its share of the amount which the State recovered from the Salt Mining Company.

The suit is based on the allegation that, during the period within which the salt was illegally removed by the said Salt Mining Company, the Jefferson Lake Sulphur Company, Inc., the present plaintiff, was the lessee in an exclusive mineral lease, which the State had previously granted and under which the present plaintiff was entitled to retain seven-eighths and the State was entitled to receive payment for one-eighth of all the minerals which, during the term of the lease, might be removed and reduced to possession.

The plaintiff alleges that, although the State actually received $1,427,826.51, which

included interest, cost of mining and bad faith damages, the actual value of the salt removed was $1,165,419.34, and that, therefore, it is actually entitled to seven-eighths thereof, or $1,019,741.93. But it concedes that when the money was received by the State, it agreed on an accounting with the then Attorney General of the State under which it was to receive $897,465.72. It prays, therefore, for judgment for this smaller amount and, in the alternative, that in the event it be held that this is not the correct amount due it, then it prays for judgment for such sum as represents seven-eighths of the total amount recovered, together with legal interest from March 30, 1936.

Before filing this suit, the Jefferson Lake Sulphur Company, Inc., sought the necessary permission to sue the State—in other words, the waiver of immunity to suit, which the State, as a sovereign, enjoys and which is fundamental under our system of government, and which permission or waiver may be given under the provisions of Section 35 of Article 3 of our Constitution.

In its petition plaintiff alleged that the permission to sue the State was granted by the passage, in both Houses of the Legislature, of Senate Bill No. 281 of 1944. It averred that after the said bill had passed both Houses, it was presented to the Governor of the State and was vetoed by him, and that it was not again submitted to the Houses of the Legislature in an effort to override the said veto. But plaintiff further alleged that the Governor was without right or authority to take any action on such a bill and that, therefore, his veto was without effect.

Plaintiff also alleged that prior to the filing of the suit, in which recovery was made and in which the State was the sole plaintiff, there had been filed a similar suit in which both the State and the present plaintiff had been plaintiffs; that in this earlier suit, also filed in the Sixteenth Judicial District Court, which was based on the same cause of action and on substantially the same allegations, the State had joined in the allegation that of such amount as might be recovered the State should receive one-eighth and the Jefferson Lake Sulphur Company, Inc., seven-eighths; that after service of citation in that earlier suit, the State had discontinued the suit so far as it, the State, was concerned and had filed the later suit in which recovery was ultimately made; that this had been done as the result of an understanding between the then Attorney General of the State and the attorneys for the present plaintiff that, in the event of recovery, whether by the State in the second suit, or by the present plaintiff in the first suit, such amount as might be recovered should be divided on the basis of one-eighth to the State and seven-eighths to the Sulphur Company.

Plaintiff further alleged, as its reasons for not itself prosecuting the first suit,

that when the State withdrew from the first suit, it was intended that plaintiff would intervene in the suit which the State, as the sole plaintiff, filed, but that before it had an opportunity to so intervene, the defendant in the first suit, Jefferson Island Salt Mining Co., Inc., removed that suit to the United States District Court for the Eastern District of Louisiana, basing its petition for removal on diversity of citizenship; that later certain other persons, who claimed to own the bed of Lake Peigneur, filed a suit in the United States District Court for the Eastern District of Louisiana in which they sought to enjoin plaintiff from trespassing upon or beneath the bed of said lake; that when notice of that suit was given to the Attorney General of the State, it was agreed that since all of the issues which were involved in the said later suit were also involved in the suit in which the State was plaintiff in the Sixteenth Judicial District Court, there was no need for the State to intervene in the injunction suit in the United States District Court, but that the State would prosecute the suit in the State court to final conclusion, and that any recovery would be divided on the basis already referred to; that the said injunction suit in the United States District Court has been finally dismissed; that, in order to assist in the prosecution of the suit by the State in the State court in which recovery was ultimately obtained, the attorneys for plaintiff, Jefferson Lake Sulphur Compa-ny, Inc., were appointed special assistants to the Attorney General, without compensation from the State, and that they "joined in the preparation of said suit, took an active part in the prosecution of said suit in the lower court, the Supreme Court of Louisiana [State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145], the Supreme Court of the United States [297 U.S. 716, 56 S.Ct. 591, 80 L. Ed. 1001; 297 U.S. 729, 56 S.Ct. 667, 80 L.Ed. 1011]," and that "in addition, petitioner expended the sum of $74,404.28 to accumulate and prepare evidence, for expert witnesses such as geologists, engineers, and the like, and other expenses in connection with said suit * * *."

To the petition of plaintiff, the State filed an exception to the jurisdiction, averring that "as shown on the face of said petition, the State of Louisiana has not consented to be sued herein, and, consequently, this Honorable Court has no jurisdiction." This plea was overruled and answer was filed on behalf of the State.

In its answer the State admitted that a mineral lease had been executed and had been properly transferred to the Jefferson Lake Sulphur Company, Inc., the present plaintiff, and that it included "all the bed of Lake Peigneur * * *." The State denied that any trespass, which had formed the basis of the suit in which recovery had been made, was committed "upon any property held by the petitioner", "showing on the contrary that the salt was removed

from lands of the State of Louisiana not at the time under lease to anyone." The State also denied that there had been an agreement between the then Attorney General and the attorneys for the present plaintiff that the suit, under which the recovery had been made, would be prosecuted by the State alone, but for the benefit of all parties in interest, and it averred that if there was any such agreement, neither the Attorney General nor the Governor had any authority to enter into it. The State admitted that it had received $1,427,826.51, and that no part thereof had been turned over to the present plaintiff.

The State specially denied that plaintiff is entitled to recover from it any more than it would be entitled to recover under Article 2696 of our Civil Code, based on the damage shown to have been sustained by reason of being deprived of the right to itself mine the salt which was removed by the trespasser.

In the District Court there was judgment overruling the exception to the jurisdiction, and after a trial, there was judgment in favor of the plaintiff and against the State for $897,465.72, with interest at five per cent from March 30, 1936, until paid, "with such costs as under the statutes the State is chargeable with."

On rehearing, however, limited solely to the question of interest and costs, the District Court eliminated the interest so that the judgment as finally rendered runs

in favor of the plaintiff for $897,465.72, without interest, and with "only such costs as are legally chargeable against the State of Louisiana." The State has appealed.

The Jefferson Lake Sulphur Company, Inc., has answered the appeal praying that the judgment be amended by the allowance of interest from March 30, 1936.

Before discussing the merits of the controversy, we shall first consider the legal questions which are presented by the exception to the jurisdiction, based on the contention of the State that there has been granted no legal waiver of its right to immunity from suit, since the bill on which the plaintiff relies, though passed by both Houses of the Legislature, was vetoed by the Governor of the State. This issue is clearly stated by the District Judge as follows:

"Plaintiff's contentions are: (1) That the Bill is not a law within the meaning of the Constitution, hence the provisions of paragraph 1 of Section 15 of Article V of the Constitution of 1921 do not apply; (2) that not being a law within the sense and meaning of the Constitution, it was not necessary for its validity that the Governor sign it; (3) that as it was not necessary for the Governor to sign it, his veto thereof was wholly ineffective, and that the bill as passed furnishes ample evidence of the consent of the Legislature to the filing of this suit."

As we have said, in its contention that there has been a legal waiver of the State's

immunity, plaintiff relies upon Senate Bill No. 281 of 1944, which concededly was passed by a substantial majority of both Houses of the Legislature.

It is conceded by plaintiff that after the said Bill had passed both Houses, it was sent to the Governor of the State and in due course was vetoed by him, and that it was not again presented to the Houses of the Legislature in an effort to override the veto of the Governor.

The Constitution, in Section 35, Article 3, provides: "Whenever the Legislature shall authorize suit to be filed against the State, it shall provide a method of procedure and the effect of the judgments which may be rendered therein."

It will be seen at once that in this Article no express reference is made to the necessity of action by the Governor, and we noted this in Lewis v. State, 207 La. 194, 20 So.2d 917, 920, in which we discussed the identical question. There we said: "Under the wording of Section 35 of Article 3 of the Constitution, the right is vested in the Legislature, and not in the Legislature with the approval of the Governor, to authorize the institution of a suit against the state. The constitutional provision reads in part: 'Whenever the *Legislature* shall authorize suit to be filed against the State, * * *.' (Writer's Italics.) The provision does not declare that the Legislature shall, by a law formally adopted, permit suit to be brought against the State, but merely that the Legislature shall authorize such a suit, without specifying the manner in which such authorization may be given. In other words, the Legislature may, without attempting to pass a general or special law pursuant to the constitutional provision, pass a joint resolution, which, although not effective as a law, is effective as a consent of the State to subject itself to suit. Under Section 17 of Article 5 of the Constitution of 1921, such a resolution when passed by the Legislature would become effective without the approval of the Governor."

We can think of no language which could more clearly have expressed the view that the Legislature alone, regardless of any action by the Governor, may grant such waiver of immunity.

It is true that in the opinion rendered in that case, in the paragraph immediately preceding the above quoted language, we said that, as a matter of fact, the Bill which was there involved "became a law by limitation," since, "having been submitted to the Governor for his approval or disapproval", it had not "been acted upon within the time limit prescribed by the Constitution."

It is also true that had there been no other contention made and considered in that case, it would not have been necessary for us to hold that such a Bill cannot be affected by any action of the Governor after we had already held that that partic-

ular Bill had become law because of the Governor's failure to act on it within the time limit.

But there was another attack which was made in the Lewis case on the legality of the Bill, which had granted the permission to file that suit. That other attack was based on the fact that though the venue of the suit, which was authorized to be brought, was referred to in the title, it was not referred to in the body of the Bill. In considering that other attack, we held that it was unimportant that the body of the Bill had not referred to the venue, although it was referred to in the title, for the reason that the said Bill was merely "in the nature of a joint resolution"; that it was not a statute at all; not "a special or general law which is required to be passed in accordance with the rules and solemnities prescribed by the fundamental law * * *."

Thus the language, which we have already quoted, was essential to the holding that the Bill was not unconstitutional because of the variance between its title and its body.

The State calls attention to some sixteen cases from other jurisdictions, referring to them as typical of the jurisprudence in practically all of the States, to the effect that such a waiver may be granted only by legislative act which must be acted upon by the Governor. We do not know what may be the provisions of the Constitutions and statutes of those other states, but in the Lewis case we interpreted the Constitution of this State as not requiring that such a waiver be submitted to the Governor.

The State also calls attention to the fact that since 1874 there have been passed by the Legislature of Louisiana some sixty bills, in each case granting waiver of the immunity and that in each of those sixty cases the Bill was submitted to the Governor for his approval or disapproval. Counsel for plaintiff say, however, that in none of those cases was the Bill vetoed and, therefore, until this case was presented, the question never arose in the courts of the State.

The doctrine of contemporaneous construction, which the State invokes in connection with the statement that each of those sixty earlier Bills was submitted to the Governor for approval, must yield to the doctrine of judicial interpretation, the interpretation being found in our decision in the Lewis case, supra.

We hold then that the plaintiff was duly authorized to bring this suit and that if the facts and the law justify, judgment may be rendered against the State, subject to such action as may be taken by the Legislature and the Governor, if and when the legislation necessary to appropriate funds to pay such judgment shall be introduced.

The plaintiff, in support of the contention that it was authorized to file this suit, presents the additional argument that the State might have been sued even without a waiver of immunity, because of the fact that, in leasing its lands for exploration for minerals, the State does not act in a governmental capacity, but in a private or quasi private one, and that, therefore, in controversies growing out of such leases, it is subject to suit even without its consent. This argument is based on what this Court said in Begnaud v. Grubb & Hawkins, 209 La. 826, 25 So.2d 606, and State ex rel. Shell Oil Co., Inc., v. Register of State Land Office, 193 La. 883, 192 So. 519, in the first of which, at page 833 of 209 La., at page 608 of 25 So.2d, we said: "The argument that because ordinarily the State as a sovereignty can not be sued in its courts except with its consent is untenable. It overlooks the fact that while the State possesses Legislative, public and governmental power in the exercise of which it is a sovereignty and governs its people, it also possesses proprietary and quasi private power conferred upon it not for the purpose of governing its people but for the private advantage of the inhabitants of the State itself as a legal personality. This distinction in the powers of the State was pointed out in the case of State ex rel. Shell Oil Co. v. Register of State Land Office, 193 La. 883, 192 So. 519. In that case this Court held that when the State executed a mineral lease it

was acting in its proprietary or quasi private capacity and that having accepted the benefits under the lease it could not escape its obligations—among which was the obligation of warranty."

In view of the conclusion reached on the question of the right of the Governor to veto such a Bill as was passed, we find it unnecessary to consider this second contention at this time.

We find no real dispute over the facts on which the suit is based, except upon the question of whether the Attorney General entered into an agreement for a division of the fund. The execution of the lease and its transfer to the Jefferson Lake Sulphur Company, Inc., is admitted. The amount of the recovery is admitted, and it is conceded that all of the salt which was removed was extracted within the contour lines of Lake Peigneur as follows:

|  | tons |
|---|---|
| 6 foot line above mean Gulf level— | 213,225 |
| 5 foot line above mean Gulf level— | 184,733 |
| 4 foot line above mean Gulf level— | 157,971 |
| 3 foot line above mean Gulf level— | 77,354 |
| 2 foot line above mean Gulf level— | 17,094 |
| 1 foot line above mean Gulf level— | 12,609 |
| 0 foot line—mean Gulf— | 952 |

The State asserts that since the lease was executed in 1924, there was included in it only such area as was actually covered by water in that year; in other words, that when, in 1924, the State leased the "bed" of the lake, it leased only such area

as was at that time covered by water, and that no former portions of the lake bed that may have become dry, whether by nature or artificial means, were included in the lease.

When, in its answer, the State advanced this contention, the plaintiff filed a special plea of estoppel in which it made the following assertions:

"That defendant herein is estopped from contending that State Mineral Lease No. 124 does not cover all of the bed of Lake Peigneur up to the 6' line above mean Gulf level as established by the Supreme Court of the State of Louisiana in the matter entitled 'State of Louisiana v. Jefferson Island Salt Mining Company, Inc., et als.,' No. 33,148 of said Court."

It appears that in two prior leases, one made in 1916 and the other in 1919, the State had leased the bed of this same lake to others and that in those leases the entire leased area was termed as land. It appears also that in determining the area contemplated by such leases reference is made to official maps and that the only official map in the State Land Office showing the area of Lake Peigneur is what is known as the Boyd Survey of 1884, and that according to that survey the extent of the Lake was fixed as that area within the meander line six feet above mean Gulf level. Furthermore, as noted by the District Judge, in the case in which the State recovered the fund in controversy, this Court in effect fixed the area when it said: "The mean high-water mark of Lake Peigneur is hereby decreed to be the 6-foot line above mean Gulf level."

We see nothing in the lease which indicates that there was the slightest intention to exclude from the area leased any "land" which the State owned in the area included within the meander line six feet above mean Gulf level. We, therefore, conclude that since all the salt upon which the State recovered from the Jefferson Island Salt Mining Co., Inc., was taken from that area, all of it was taken from within the area contemplated by the lease held by the present plaintiff.

The next contention made by the State is that, although the recovery which it made was based on the sale value of the salt, nevertheless the right of the present plaintiff against it should be limited to such damage as it can show it sustained as a result of being deprived of the right to itself mine and sell the salt. This contention is based on the provisions of Article 2696 of the Civil Code, which reads as follows: "If the lessee be evicted, the lessor is answerable for the damage and loss which he sustained by the interruption of the lease."

The contention is this; that under a mineral lease, no ownership of minerals is transferred from the owner of the lands to the lessee; that all that is conveyed is the right to explore for minerals and that

the ownership of the minerals does not come into being until they are actually mined and reduced to possession. Therefore, says the State, the plaintiff never having had possession of the salt in question, can not claim its value but can only present a claim for such damage as it can show that it sustained as a result of having been deprived of the right to explore for salt and to remove and sell such salt as it might have found. It is argued that the plaintiff was not and is not in the salt mining business; that it has no equipment or facilities for mining salt and has no selling organization for putting it on the market, and that, therefore, if it had itself discovered, mined and sold the salt, the operation would have been tremendously more expensive and that, therefore, its actual profit, if any, would have been very much smaller than that which was realized by the other company, the Jefferson Island Salt Mining Co., Inc., the trespasser, regularly engaged in the business of mining and selling salt.

In the first place, in Gulf Refining Co. of Louisiana v. Glassell, 186 La. 190, 171 So. 846, 854, we said that: "We made no attempt to make an exclusive list of the remedies such a party is entitled to under the law, nor to confine the remedy to an action for damages only."

Whatever may be the relationship between the lessor and the lessee in an exclusive mineral lease, we are unable to agree that Article 2696 of our Code has any application to facts such as are shown here, and that, because of that article, the right of the plaintiff to recover from the State is limited to such profit as it can show that it would have made had it itself mined and sold the salt.

Had the trespasser not been compelled to pay to the State the value of the salt removed by the trespasser—in other words, had the trespasser escaped with its gain, then it might have been quite proper to hold that since the lessor, the State, had made no gain on the transaction, but had merely failed in its duty to the lessee and had thereby permitted the lessee to sustain damage, its liability should be limited to the amount of that damage, i. e., the profit which the lessee would have made.

Surely, however, the State, as lessor, cannot be permitted to itself recover from the trespasser the much larger amount and then say to its lessee that the right of the lessee should be adjudicated on a different basis.

Undoubtedly the reason that prompted the State to withdraw from the first suit in which it was joined as plaintiff with the Jefferson Lake Sulphur Company, Inc., and in which the joint plaintiffs sought to recover together what the State ultimately recovered alone was the fear that a lessee might not at that time have had the right to maintain such an action against the trespasser. In Gulf Refining Co. of Louisiana v. Glassell, supra, this Court, citing

earlier decisions, held that a lessee "is in the same position as an ordinary lessee of realty and is not entitled to institute a petitory action in his own right," and that one who obtained such a lease obtains not an ownership in such minerals as may lie beneath, but only a right to attempt to find and reduce such minerals to possession.

The District Judge calls attention to the fact that as a result of this decision (Gulf Refining Co. of Louisiana v. Glassell, supra), which was rendered on November 4, 1936, the Legislature, in 1938, passed Act No. 205 in which it is provided that the rights of a lessee in such a lease "may be asserted, protected and defended in the same manner as may be the ownership or possession of other immovable property by the holder of such rights, without the concurrence, joinder or consent of the landowner, and without impairment of rights of warranty, in any action or by any procedure available to the owner of immovable property or land."

We agree with the District Judge that:

"If this act had been in existence when the joint suit of plaintiff and defendant was filed in the 16th Judicial District Court, there would have been no question, if ever there was a question, as to plaintiff's right to appear as a party to that suit.

"This being true, it must be conceded, it seems to me, that plaintiff's sole remedy would not have been as the State here asserts, a suit against the lessor for damages

sustained by reason of the interruption of the lease. * * *"

Much time is devoted in the briefs as to whether such a suit as this was one for specific performance, and Gulf Refining Co. of Louisiana v. Hayne, 148 La. 340, 86 So. 891, 893, is cited as authority for the contention that it is. And it is true that where specific performance is possible, it will be ordered. We agree with the District Judge, who said:

"This case, it seems to me, is sufficient to characterize the case at bar as one for specific performance of the mineral lease contract and warrants the Court in affording the same kind of relief. At any rate, if the State has in its possession money belonging to plaintiff, whether the suit be properly called one for specific performance or not, I see no legal reason why plaintiff can not sue to recover something, the ownership of which it claims.

"Even if the so-called adjustment and agreement fixing plaintiff's portion of the total sum recovered was proven and held to be valid, plaintiff's action would not stem from that source, but would exist, as it does exist, by reason of its ownership of a part of the recovery."

Under the terms of the mineral lease which the State granted, no one but the lessee had the right to mine the salt. Had the State mined the salt it would have done so for the account of the lessee. In Gulf Refining Co. of Louisiana v. Hayne, su-

pra, we said that when the owner of the land executed a mineral lease "he divested himself fully and completely of the right to exploit this land for oil, and vested plaintiff company fully and completely with that right, in so far as his one-third interest was concerned, so that when he in conjunction with his co-owners operated on the land for oil, he was merely exercising a right belonging to plaintiff company, and necessarily the fruits of the exercise of that right must belong to the owner of the right." When the State permitted the trespasser to mine the salt and then recovered from the trespasser, it did so for account of the lessee, and under its lease it was entitled to a royalty of one-eighth only.

Our conclusion is that the right of the plaintiff is not limited to such damages as it can show that it itself suffered, but that it should recover from the State on the same basis as that on which the State recovered from the trespasser. On this basis it is entitled to seven-eighths of the amount recovered.

We come then to a consideration of the effect of the agreement made between the then Attorney General and the attorneys for plaintiff corporation. That there was an agreement is evident from the statement of the then Attorney General, Honorable Gaston L. Porterie. But we find too that this statement does not set forth any amount nor proportion to which the plaintiff is entitled, but merely that "the Jefferson Lake Sulphur Company, Inc., would

receive a portion of the money recovered by the State in said suit, due to the fact that State Mineral Lease No. 124, covering the bed of Lake Peigneur, was owned by the Jefferson Lake Sulphur Company, Inc., at the time that the trespass was committed."

We have been shown no legislation nor other authority conferring upon the Attorney General the right to agree as to plaintiff's share of such an amount, nor do we find any other evidence than that statement showing that the Attorney General attempted to do so.

Whatever may be the effect of such an agreement as is referred to by Judge Porterie, it is evident that since the plaintiff itself has alleged that the amount to which it was entitled was fixed in the agreement and that the amount is less than it might otherwise have been entitled to receive, its recovery should be limited to that sum.

We next consider the question of whether interest should be allowed on the claim against the State and note at the outset that the well established general rule is that a State, as a sovereign, is not responsible for interest unless made so by express statute or by stipulation The latest expression on the subject is found in Makofsky v. Department of Highways, 205 La. 1029, 18 So.2d 605, 606, wherein we said: "While in the modern trend there may be a gradual encroachment on the

hitherto sacred domain of sovereign non-responsibility, nevertheless, as was recently pointed out in the case of Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627, 630, '* * * a state or its agencies cannot be compelled to pay interest * * * unless provision is made therefor by stipulation or by a specific statute, * * *.' "

In Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627, 630, we said that "general laws relative to the payment of interest are not applicable."

Counsel for plaintiff recognize this well established rule, but seek to convince us that here there is express legislative authority under which we may impose the charge of legal interest against the State. They say that in both the Boxwell case and the Makofsky case, it was the Department of Highways of the State which was the defendant and that in the legislative authority under which the Department of Highways may be sued, there is no express permission given to claim interest from that Department. And they further call attention to the fact that there is a plain distinction between the wording of that statute authorizing suits against the Department of Highways and the Bill which authorized the suit now under consideration.

It is true that in the statute which authorizes suits against the Department of Highways, it is provided that the Department may be sued in any competent court "subject to all applicable laws relative to jurisdiction," Act No. 4 of 1942, § 8, whereas in the Bill under which this suit is brought, it is provided that the courts "shall apply the rules of law and method of procedure applicable to suits between persons involving this or similar cause or causes of action."

The point which counsel seek to make is that whereas in the case of the Department of Highways the waiver involved only the immunity to suit, the Bill which authorized this suit provided that we should apply such laws as are applicable in suits between private individuals.

While there seems to be some difference in this regard between the statute in the one case and the Bill in the other, the principal difficulty which confronts the plaintiff in connection with the interest claim lies in the fact that in addition to the requirement that the allowance of interest must be "expressly" authorized, there is the further requirement that this authority must be given in a "specific statute" (Makofsky v. Department of Highways, supra), and that even "general laws relative to the payment of interest are not applicable" (Boxwell v. Department of Highways). And we remember that the entire burden of plaintiff's argument on the exception to the jurisdiction, wherein it was shown that the Bill here involved had never become a "statute", was that a "statute" was not necessary.

There is an alternative argument on behalf of plaintiff that interest should nevertheless be awarded because in the granting of such a lease the State, having acted in a proprietary or quasi private character and therefore being subject to suit, even without an express waiver of immunity, should be liable for interest just as a private person would be held. This argument that a waiver of immunity is not necessary in litigation growing out of a mineral lease granted by the State is based on what was said in State ex rel. Shell Oil Co. v. Register of State Land Office, 193 La. 883, 192 So. 519, and Begnaud v. Grubb & Hawkins, 209 La. 826, 25 So.2d 606. However, neither of those cases involved the payment of money by the State. In each the only question of interest there was whether or not the State could be sued in an effort to force it to permit the carrying out of lease contracts executed by it. All that we held was that since the State, in entering into those contracts, had acted in a proprietary or quasi private capacity and not as a sovereign, it was amenable to suit to enforce those contracts. Since no money demand was involved in either case, we did not consider the question of liability for interest, and we adhere to the view that the State may not be held liable for interest in any case, unless the interest is authorized by specific statute, or by agreement.

While no complaint seems to be made as to the costs, it is evident that insofar as the award of costs is concerned, the judgment is correct, since it awarded such costs as are legally chargeable against the State. Those costs are limited to "those incurred for the taking of testimony." Makofsky v. Department of Highways, supra.

The judgment appealed from is affirmed.

O'NIELL, C. J., and McCALEB, J., recused.

PONDER, J., dissents and hands reasons.

BOND, J., absent.

PONDER, Justice (dissenting).

I do not believe that the State acted in a proprietary or quasi private capacity under the facts in this case. This question was not passed on in the majority opinion and I see no reason to state my views in respect to it. The act of the Legislature which was vetoed by the Governor is treated in the majority opinion and given effect as a resolution. The conclusion is based on the premise that the right to waive the State's immunity from suit is vested in the Legislature alone and not in the Legislature with the approval of the Governor under the provisions of Section 35 of Article 3 of the Constitution of 1921.

The first time any reference was made to the waiver of the State's immunity from suit in the Constitution of this State was

the provisions contained in Article 192 of the Constitution of 1898, which reads as follows: "Whenever the General Assembly shall authorize a suit against the State it shall provide in the *act* authorizing the same, that such suit be instituted before the District Court at the State Capital; that citation to answer such suit shall be served both upon the Governor and the Attorney-General; that the Supreme Court of the State shall have appellate jurisdiction in such suit, without regard to the amount involved; that the only object of such suit, and the only effect of the judgment therein, shall be a judicial interpretation of the legal rights of the parties for the consideration of the Legislature in making appropriations; that the burden of proof shall rest upon the plaintiff while claimant to show that the claim sued upon is a legal and valid obligation of the State, incurred in strict conformity to law, not in violation of the Constitution of the State or of the United States, and for a valid consideration, and that all these things shall be affirmatively declared by the Supreme Court before any judgment is recognized for any purpose against the State." (Italics ours.)

The identical provisions are incorporated in the Constitution of 1913. In the Constitution of 1921, they were changed to read as follows: "Whenever the Legislature shall authorize suit to be filed against the State, it shall provide a method of procedure and the effect of the judgments which may be rendered therein." Section 35, Article 3 of 1921.

In the year 1878, prior to the adoption of the Constitution of 1898, the following pronouncement was made by Justice Spencer in the case of Lord Cecil et al. v. Board of Liquidation, 30 La.Ann. 34, viz.: "A State can be sued only by its own consent, and it may therefore impose such limitations and restrictions on the right of suit as it pleases. Hence this court, in determining its powers and duties in cases against the State, must look to the *act* authorizing the same, in order to determine the scope and limitation of its power and jurisdiction. Outside of the act authorizing the suit, and beyond the limitations therein fixed, it is absolutely without authority to hear and determine; and must therefore confine its investigations within the limits and to the objects specified." (Italics ours.)

In the case of Durbridge v. State, 117 La. 841, 42 So. 337, 343, the following observation was made: "The plaintiff conducted his case in the district court as if it were an ordinary suit between private litigants to be governed, and decided by the application to his demand of the general rules as to the admissibility of evidence; the sufficiency and weight of evidence and as to which of the parties litigant carried the burden of proof. He overlooked the fact that the suit was brought before the court under exceptional conditions which the state was free to

impose, and to which he was bound to conform, and that the court itself under the statute was required to make special findings, and render a special judgment similar to that referred to in the case of Lord Cecil v. Board of Liquidation, 30 La. Ann. 35."

It is also stated in the Durbridge case: "The right of the General Assembly to waive its right of exemption from suit, and to grant permission to sue, is not derived from article 192 of the Constitution of 1898. It antedated that Constitution. The article in question merely fixed certain features of the demand, and of the suit, and of the effect of the judgment when rendered."

The opinion in the Durbridge case was handed down in the year 1906, after the adoption of the Constitution of 1898.

In the case of Hood v. State, 120 La. 806, 45 So. 733, 734, the following pronouncement in the Durbridge case was quoted with approval: " 'The right of the General Assembly to waive its right of exemption from suit and to grant permission to sue is not derived from article 192 of the Constitution. The article in question merely fixed certain features of the demand under certain circumstances and of the suit and the effect of the judgment when rendered.' "

Immediately after this quotation, this statement was made in the Hood case: "The article in question had specially in

view demands calling for the making of appropriations by the General Assembly."

I am of the opinion that the authority to waive the State's immunity from suit is not derived from either of the three Constitutions, but, as stated in the above quoted authorities, it antedated these Constitutions. I am also of the opinion that Section 35, Article 3 of our Constitution merely imposes limitations and restrictions on the right to sue by providing the method of procedure and the effect of judgment.

Prior to entertaining this appeal, I had occasion in another case pending before our Court to review the jurisprudence of this State and that of many other states and found not a single authority to the effect that the Legislature alone could waive this immunity. In fact, the authorities are to the effect that the waiver must be by a constitutional provision or law enacted by the Legislature. I found one case decided by the Supreme Court of Georgia that appeared to hold that the waiver could be made by a joint resolution, but, upon reading the case, I found that it had to be submitted to the Governor for approval. I will cite some of the authorities which bear out these views: 13 A.L.R. 1276; 42 A.L.R. 1272 and 1464; 50 A.L.R. 1408; 49 Am.Juris., Title "States", Sec. 96, p. 313; 59 Corp.Juris., Title "States", Sec. 460, p. 302, and the many authorities cited thereunder.

An examination of the jurisprudence of this State shows that the Legislature has never attempted to waive the State's immunity from suit except by an act or a statute. The statement quoted from the Lewis case and the sole authority relied on in the majority opinion is, in my opinion, obiter. A reading of the opinion in the Lewis case reflects that a pronouncement was made therein that the act had become a law by limitation and it was pointed out that the title of the act did not violate the article of the Constitution applicable to the enactment of a law. However, if it should be considered a pronouncement, it should not be followed because it is founded on an incorrect premise, viz.: that the article of the Constitution authorized the Legislature alone to waive the State's immunity, when, as a matter of fact, the authority to waive the immunity is not derived from the Constitution.

Moreover, the Legislature has consistently construed its own powers and has never attempted to waive the immunity of the State except by an act which they submitted to the Governor. This Court has consistently entertained appeals from lower courts where acts of this nature have been declared unconstitutional and it has applied the provisions of the Constitution applicable to the enactment of laws. Our jurisdiction undoubtedly flows from the provision in the Constitution granting us appellate jurisdiction when a law has been declared unconstitutional. The reason that

the Constitution of 1921 does not provide for the appellate jurisdiction in suits of this nature is because we have already been granted, by that Constitution, appellate jurisdiction where a law has been declared unconstitutional.

Section 35 of Article 3 of 1921 simply means that when the law making body waives the immunity of the State from suit, it shall provide the law of procedure and the law governing the effect of the judgment. I believe "a method of procedure and the effect of the judgments" must be perfected by a *law*. There are many expressions in our Constitution that "the Legislature shall provide" where it is contemplated that it shall provide by law but does not specifically say that it shall provide *by law*. This, in my opinion, shows that the Constitution frequently speaks of the Legislature in the light of the law making body, and did so in this instance. I am fortified in this belief by the fact that the Constitution of 1898 recognized the fact that the waiver must be by the enactment of a *law* when it said: "Whenever the General Assembly shall authorize a suit against the State, it shall provide in *act* authorizing the same, * * *." This evidently contemplates that the waiver is to be made by an act or a law and that the authority of the law making body is already vested with these powers.

I do not see how the act that has been vetoed by the Governor can be given the effect of a resolution. When the act was

vetoed it was killed for all intents and purposes and cannot be revived as a resolution. How can it be said that the Legislature was willing to waive the State's immunity without the approval of the Governor when it made no attempt to do so? Moreover, the Legislature made no attempt to override the veto of the Governor and this, in my opinion, amounts to an acquiescence on the part of the Legislature in the Governor's action.

It does not appear reasonable to me that the framers of our Constitution would authorize the Legislature to waive the State's immunity from suit by a resolution of a mere majority of its members and at the same time require the approval of the Governor of any appropriation that might be made to pay any judgments rendered in the suit.

The chief executive of the State has often been referred to as the "watchdog" over the State's finances. It is his duty to pass on all appropriations and each item thereof. It is equally his duty to protect the credit of the State. His approval or authorization of suits against the State is as essential to the maintaining of the credit of the State as his approval of appropriations to pay any judgments rendered in such suits.

Prior to the Constitutions of 1898, 1913 and 1921, the Legislature had authority to pass any law that was not prohibited by the Constitution. It had the right to pass

a law waiving the State's immunity from suit. The provisions in these three Constitutions merely limits and restricts the right. It has been stated in some of the cases that an act waiving the State's immunity from suit is a special act and not a local or special law in the contemplation of the Constitution requiring publication, but it is a law nevertheless.

For the foregoing reasons, I respectfully dissent.